FOSTER NORTH

296:168 Mas

*v.*

THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS.

*Filed at Ottawa March 30, 1891.*

1. FREEDOM OF RELIGIOUS WORSHIP—*University of Illinois—rule requiring attendance at chapel.* A rule of the Illinois university required all students to attend the morning service at chapel unless excused for good cause. It appeared that the daily practice at chapel meeting was for one of the members of the faculty to read a portion of the New Testament and repeat the Lord's Prayer, sing religious hymns, and occasionally to give brief morning talks, but that these exercises were not sectarian, and did not exceed five to ten minutes. The rule authorized the excusing of any one from attending chapel who might sign a request to that effect: *Held,* that such rule was not prohibited by the constitution or laws of the State, and was not unreasonable.

2. The constitutional provision (sec. 3, art. 2,) that "no person shall be required to attend or support any ministry or place of worship against his consent," is not violated or infringed by a rule of the Illinois university requiring students therein to attend chapel exercises, as applied to those who are willing to obey it, nor as to others who may be excused from religious services at chapel, on their application, for good cause.

3. MANDAMUS—*when in name of the People.* Where a party seeks, by *mandamus*, to compel the board of trustees of the University of Illinois to re-admit him to the university, from which he had been expelled nearly five years before, without requiring him to obey one of its rules, and without requiring him to ask to be excused from obedience thereto, and his petition shows that the writ is not sought for the purpose of securing an individual right, but for the sole purpose of questioning the right of the board to adopt a rule which he alleges to be an infringement upon the constitutional rights of students generally, in the institution, the writ will be denied. The right to adopt rules for the government of students must be questioned in the name of the People.

4. SAME—*petition by private person—what the petition must show.* A petition for *mandamus* by a private person must clearly show that the petitioner has a personal interest in the thing he seeks to compel to be done. The petitioner must show that he has been injured in his personal interests by the refusal of the defendants to do a duty imposed upon them by law.

5. SAME—*abstract rights.*  *Mandamus* will not lie, on the petition of a private citizen, merely to settle some doubtful question, but to entitle him to the writ he must clearly show that he has a legal right which has been denied, and that the denial of such right affects his personal interest.  The writ is never awarded to settle mere abstract rights, unaccompanied by practical or substantial benefits.

6. SAME—*to control exercise of discretion.*  In all matters requiring the exercise of official judgment resting in the sound discretion of the person to whom a duty is confided by law, *mandamus* will not lie, either to control the exercise of that discretion, or to determine the decision which shall be finally given.  This applies to the discretionary power vested in the trustees of the University of Illinois to make reasonable rules and regulations for the government of that institution.

7. SAME—*when issued—clear case.*  The statute dispensing with the alternative writ does not relieve the relator from the common law requirement of showing a clear and indubitable right to the relief demanded, and every material fact necessary to show that it is the legal duty of the defendant to do the thing demanded must be averred in the petition which now takes the place of the alternative writ.  The writ is only issued in a clear case, and in the discretion of the court.

8. SAME—*doubtful case.*  This writ ought not to issue in any case unless the party applying for it shows a clear legal right to have the thing sought by it done, and in the manner and by the person or body sought to be coerced, and it must be effectual as a remedy if enforced, and it must be in the power of the party, and his duty, also, to do the act sought to be done.  In a doubtful case the writ should not be awarded.

This was a proceeding by *mandamus,* instituted in this court. The facts of the case appear in the opinion of the court.

This is an original *mandamus* proceeding, the case being submitted on a demurrer to the answer, which respondents insist should be carried back and sustained to the petition.

It is averred in the petition that petitioner became a student in the respondents' university in September, 1879, and was wrongfully expelled therefrom in April, 1885, but for which expulsion he would have received the degree of Bachelor of Science in June of that year; that among the rules of said university was one requiring all students to attend the chapel each morning, which, from some time in the month of Feb-

ruary, 1885, he refused to obey, and that his expulsion was for that cause, and no other; "that at the morning meeting in said chapel it was the daily practice for one of the members of the faculty to read a portion of the New Testament and repeat the Lord's Prayer, sing religious hymns, and occasionally give brief morning talks," and also make announcements; that egress from the chapel was denied all students during such exercises, so that presence at a part thereof necessitated attendance upon all; that on April 1, 1885, he was called upon by the faculty to give an excuse for his absence, and then stated "that compulsory attendance upon religious services was prohibited by the constitution of the State of Illinois, but further stated that he had no objection to attendance at the chapel except at the religious services there held; that it was only the religious services that he refused to attend, but that legitimate business of the chapel meetings was so connected with those religious services that it was impossible to attend the one and not the other;" that on April 3 he was notified that such excuse would not be accepted by the faculty, and continuing to disobey said rule, he was on April 22, 1885, asked by the regent of said university to sign a written request to the faculty to be excused from chapel exercises, stating that such exercises were repugnant to his religious convictions, and in violation of what he conceived to be his rights of conscience. To this he replied: "I can not sign the petition you present me: First, because I have no religious convictions whatever for the chapel exercises to be repugnant to; and second, because by signing it I would be admitting that the faculty has the legal right to compel attendance upon chapel services, which I deny, and would be asking a favor from yourself and the faculty that is not accorded to others,—and that I shall never do." In the same communication he further stated: "The first thing, then, to be settled is, has the faculty any legal authority to adopt the rule which I am charged with violating," and then proceeded with what is offered as an

argument in support of his contention that the rule is violative of section 3, article 2, of the constitution of this State. His suspension was ordered April 30, 1885. He filed this petition March 29, 1890, and in it alleged that on the 11th day of that month he applied to the vice-regent, who was authorized to admit students to said university, "for admission to classes therein, and though there was no objection raised by the regent and faculty as to his general deportment or scholarship, the said vice-regent refused him such admission because of the suspension aforesaid," which action he alleges was confirmed by the board of trustees. He seeks a peremptory writ of *mandamus* against the board of trustees, to compel it to restore him to all his rights and privileges in said university, as fully and completely as if he had never been suspended.

The answer alleges that said board of trustees have power to make all reasonable rules and regulations for the government of said university, and "that prior to the time petitioner became a student therein, it had adopted certain rules and regulations concerning the admission of students, and their attendance therein, which were duly entered upon its records, and which were then, and have been since, in full force, to be complied with by all students attending the same, except when, for good cause, they might be excused from compliance with one or more of said rules and regulations, upon application therefor; that said rules required each applicant for admission to said university to sign a promise, that during his connection therewith he would yield obedience to all lawful authorities therein, and that relator, upon entering said university, did so promise, and then and there promised to obey all the rules of said board of trustees, and upon that condition was admitted to and entitled to remain a student in said university." It also avers, "the rules of said board of trustees and of said faculty required all students to meet in the chapel of the university each morning, unless excused, as aforesaid; that at

such meetings it was and is the custom for the regent, or other member of the faculty, to read a short selection from the New Testament, without comment, and to recite the Lord's Prayer, which exercises do not exceed from five to ten minutes; also, to give the students such general instructions as were desirable and appropriate, and to give publicity to such orders, directions and notices as might be deemed suitable and requisite for the proper conduct and management of the university; that said rules were reasonable, and requisite for the good order and management of said university and the successful education of the students therein, and that it was the duty of Foster North to comply with such rules, and that upon entering the university he did obligate himself to comply with the same; that said relator did comply with said rule from September, 1879, to February, 1885; that relator did not, at any time, ask to be excused from complying with said rules, but from the month of February, 1885, to the 23d day of April, 1885, said Foster North did willfully, and in willful violation of the rules adopted by the lawful authorities of the State University aforesaid, and in open defiance thereof, absent himself from attendance at the meetings of the students required by said rules to be held daily, and, notwithstanding frequent requests and solicitations by members of the faculty during that time upon said Foster North to comply with said rule, he, the said Foster North, arbitrarily, and in defiance of the authority of the said board of trustees and of the faculty, refused to attend such meetings, and also refused to ask to be excused therefrom, and denied the right or authority of said trustees to ask such attendance, whereupon the said faculty, on the 23d day of April, 1885, suspended said relator from the benefits of said university and the right to attend the same as a student, which said action was afterwards approved by the board of trustees of the university, and said Foster North has, by reason and on account thereof, been denied the privileges of the said university, and for no other cause."

.'Messrs. McDOUGAL & CHAPMAN, for the petitioner.

Mr. GEORGE HUNT, Attorney General, for the People.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

A peremptory writ of *mandamus* is here sought on the petition of a private individual. No public rights are involved. The petition must therefore clearly show that petitioner has a personal interest in the thing he seeks to compel the respondents to do. He must clearly show that he has been injured in his personal interest by the refusal of the defendants to do a duty imposed upon them by law. *The People ex rel.* v. *Masonic Benevolent Ass.* 98 Ill. 637; High on Extraordinary Remedies, sec. 431.

*Mandamus* will not lie, on the petition of a private citizen, merely to settle some doubtful question, but to entitle him to the writ he must clearly show that he has a legal right which has been denied, and that the denial of such right affects his personal interest. The writ is never awarded to settle mere abstract rights, unaccompanied with substantial or practical benefits. (*Gormley* v. *Day*, 114 Ill. 185.) "The writ of *mandamus* is a high prerogative writ, to be awarded in the discretion of the court, and ought not to issue in any case unless the party applying for it shall show a clear legal right to have the thing sought by it done, and in the manner and by the person or body sought to be coerced, and must be effectual as a remedy if enforced, and it must be in the power of the party, .and his duty also, to do the act sought to be done. It is well ·settled that in a doubtful case this writ should not be awarded. It is never awarded unless the right of the relator is clear and ·undeniable, and the party sought to be coerced is bound to act." *The People* v. *Hatch*, 33 Ill. 140; *The People* v. *Glann et al.* 70 id. 232.

Our statute dispensing with the alternative writ has not ·relieved the relator from the common law requirement of show-

ing a clear and indubitable right to the relief demanded, and every material fact necessary to show that it is the legal duty of the defendant to do the thing demanded must be averred in the petition which now takes the place of the alternative writ. (*The People ex rel.* v. *Davis et al.* 93 Ill. 133; *The People* v. *Madison County*, 125 id. 341.) The writ is only issued in a clear case, and in the discretion of the court. *Brokaw* v. *Comrs. of Highways*, 130 Ill. 482.

The petitioner here seeks to compel the defendants to re-admit him to the University of Illinois without requiring him to obey one of its rules, and without requiring him to ask to be excused from obedience thereto. First, does he show by his petition that his purpose in so doing is to vindicate a personal right or protect an individual interest? He states no facts in his petition from which it can be seen that he will be injured in any way if the writ is denied. He simply shows, that after nearly five years of acquiescence in the action of the faculty and board of trustees suspending him, he "applied" for admission to classes in said university, and was refused because of said suspension." What classes he made application to enter and what his purpose was in making such application,—whether to pursue his course of studies therein or merely for the purposes of this suit,—he does not say. After these years of unexplained delay he can not even claim that it should be inferred that he made such application with the desire and intention of in good faith resuming his course of study in said university. But if he could, as we have seen, his right and interest are not to be left to inference, but must be clearly averred when this extraordinary writ is invoked. More than this, when his allegation of application for re-admission is considered in connection with the other averments of the petition, it is clear that the application was made, not for the purpose of securing an individual right, but for the sole purpose of questioning the right of the board of trustees to adopt the rule, which he condemns as an infringe-

ment upon the constitutional rights of students, generally, in the institution. By his own showing, from the inception of his disobedience his purpose has been, not to protect a personal interest, but to compel respondents to abrogate one of the long-established regulations of the university. This motive was clearly disclosed in his communication to Dr. Peabody, dated April 23, 1885. He there says, to ask to be excused would be asking a favor for himself not accorded to others, which he will never do. He also says, the first thing to be settled is, whether or not the faculty has the legal authority to adopt the rule which he had violated,—thus clearly showing that he had resolved to disregard the rule, not because it interfered with his personal or individual interests, but because he sought an opportunity to test the legality of a regulation of the university as applied to all students attending the same. His theory throughout has been, that even though he could receive absolute immunity for himself from the requirement by asking it, yet, the rule existing, he was, within the meaning of the constitution, required to attend a place of worship without his consent.

It needs no citation of authorities, or argument, to show, that if respondents have exceeded their authority in adopting rules for the government of students, and any one desires to question such rules on behalf of the public, he must do so in the name of the People of the State of Illinois. But, independently of this question, we think the petition wholly fails to show that the defendants have acted unlawfully, or been guilty of any wrong. Their answer avers that they had the lawful right to adopt all reasonable rules and regulations for the government of the university, and in pursuance of that right did adopt the rule in question. This averment the demurrer to the answer admits. Moreover, the act of the legislature establishing the institution clearly confers upon them such power. It follows, that in enacting such rules they exercise an official discretion, (*McCormick* v. *Burt*, 95 Ill. 263,)

and with that discretion courts will not interfere by *mandamus.* "The rule is, that in all matters requiring the exercise of official judgment, or resting in the sound discretion of the person to whom a duty is confided by law, *mandamus* will not lie, either to control the exercise of that discretion, or to determine upon the decision which shall be finally given." High on Extraordinary Remedies, sec. 42.

It certainly will not be insisted that the rule requiring students to attend chapel exercises is unreasonable or unlawful as applied to those who are willing to obey it. The legality of the rule is questioned on the sole ground that it violates that clause of section 3 of article 2 of the constitution of this State which says, "No person shall be required to attend or support any ministry or place of worship against his consent." It is not pretended by the petitioner that the exercises at the chapel meetings were sectarian, and therefore objectionable, but the only objection to those exercises was and is, that they were in part religious worship, within the meaning of the above quoted language of the constitution. In the view we take of the case that fact may be conceded. The real question on this branch of the case is, was it a violation of that constitutional provision for respondents to adopt the rule, and require obedience thereto by those attending the university, unless excused therefrom. There is certainly nothing in this section of our constitution prohibiting this and like institutions of learning from adopting reasonable rules requiring their students to attend chapel exercises of a religious nature, and to use at least moral suasion and all argumentative influences to induce obedience thereto. It is a well known fact that such institutions do generally adopt similar regulations, and that, with rare exceptions, those attending them yield cheerful obedience thereto, regardless of their personal views on the subject of religion. Many esteem it a privilege to be allowed to attend such exercises. Parents placing their children in colleges and universities often desire that they shall be brought under such

influences. Shall a court say such a requirement is, in and of itself, a violation of said constitutional provision, merely because some one or more students attending the university *may* object to obeying it? More especially, should this be done when, as is here shown by the answer, the rules expressly provide that for good cause students may be excused from obedience to such regulation? We have said in construing this section of the constitution: "Religion and religious worship are not so far placed under the ban of the constitution that they may not be allowed to become the recipients of any incidental benefit whatever from the public bodies or authorities of the State." (*Welch et al.* v. *Sherer et al.* 93 Ill. 64.) It may be said with greater reason that there is nothing in that instrument so far discountenancing religious worship that colleges and other public institutions of learning may not lawfully adopt all reasonable regulations for the inculcation of moral and religious principles in those attending them.

We are clearly of opinion that the rule is not unlawful. At most it could only be fairly contended, that, under said clause of the constitution, one so desiring it should, for reasonable cause, be excused from its observance. The whole of said section 3 being considered, it is clear that it is designed to protect the citizen in the free exercise of his religious opinions, and it should be liberally construed to that end. It is doubtless true that one owing obedience to no one else can not be required to explain or give an excuse why he does not attend places of religious worship; but a moment's reflection will convince any one that the reasons for so holding can not be applied to those who voluntarily place themselves under the government of others, or who are, by parents and guardians, placed in institutions of learning, where a code of rules must be adopted for the general government of all students attending them. In the one case, the citizen has the right to use his time as he pleases, and so long as he does not interfere with the rights of others, he may go where he will, and con-

duct himself as he sees proper. This he may do independently of all questions of conscience. In the other case, however, the will of the student is necessarily subservient to that of those who are for the time being his masters. By voluntarily entering the university, or being placed there by those having the right to control him, he necessarily surrenders very many of his individual rights. How his time shall be occupied; what his habits shall be; his general deportment; that he shall not visit certain places; his hours of study and recreation,—in all these matters, and many others, he must yield obedience to those who, for the time being, are his masters; and yet, were it not for the fact that he is under the government of the university, he could find ample provision in the constitution to protect him against the enforcement of all rules thus abridging his personal liberty. In this case, petitioner could not say the faculty had not the right to require him to spend his time in attending chapel, because they, and not himself, had the right to say how he should spend his time. He admits that the rule requiring him to attend chapel was obligatory upon him, and that he was bound to obey it as to all exercises held there except those of a religious character. What personal right, then, has he been deprived of that the faculty did not have complete legal authority to take away from him, unless it be a right of conscience? But this right he expressly stated to the faculty was not in any way interfered with. The answer expressly avers, and this the demurrer admits, that he arbitrarily, and in defiance of the authority of said "board of trustees and faculty, refused to attend chapel meetings, and also refused to ask to be excused therefrom, and denied the right or authority of said trustees to ask such attendance."

We think the conclusion is irresistible, that in his controversy with the faculty petitioner was not attempting to protect himself in the exercise of a constitutional privilege, but was only using that clause of the constitution as a shield for in-

subordination himself, and endeavoring to furnish others an excuse for disobedience. In placing an estimate upon his conduct toward the authorities of the institution, it is to be noted that the rule in question was in force from the time he became a student therein to the time he began to disobey it, and that he not only gave his consent to obey it, but for more than five years, without objection, did obey it. Will it be contended that during that period he was compelled to attend a place of worship without his consent? Was the rule unconstitutional as to him during that time? According to his own showing, when he made up his mind to no longer observe the rule, he did not so much as inform the faculty of that determination, much less make a request to be allowed to withdraw his former consent to obey it. As we have seen, he was requested to base his application to be excused from attending chapel exercises, on the only reasonable ground that it could be based. He not only refused to do that, but, according to the allegations of the answer, which he admits, refused to ask to be excused on any ground. His expulsion was the result of his own wrong. Neither the respondents nor the faculty have been guilty of a violation of law or the doing of any wrong.

The authorities cited by counsel for petitioner do not militate against this conclusion. The case of *The State ex rel.* v. *District No. 8,* 76 Wis. 177, is much relied upon as sustaining petitioner's right to the writ. The case is wholly unlike this. The relators in that case were members of the Roman Catholic church, and tax-payers in the school district. Their children attending the district school were also members of that church. The complaint was, that bible readings in the school were exclusively from the "King James version," and therefore sectarian instruction, in violation of section 3 of article 10 of the constitution of that State, "which ordains that no sectarian instruction shall be allowed in the district schools of this State." LYON, J., who wrote the principal opinion in the case, confines his discussion and decision to that question, only, and, as we

read the petition, that was the only constitutional question raised by it. In the concurring opinions filed by Casody and Orton, JJ., there is a discussion of the question as to whether or not such bible reading, as alleged in the petition, was a violation of the rights of conscience, and amounted to compelling the relators to aid in the support of a place of worship without their consent, within the prohibition of other sections of that constitution. It is manifest that all that is said in that case could not be approved by this court, consistently with our former decisions, as is there expressly recognized; but if it could, still it would by no means follow that a peremptory writ should issue in this case. None of the questions there decided are necessarily involved here.

We are clearly of opinion that there is no sufficient ground here shown to authorize the ordering of the peremptory writ of *mandamus,* and it is therefore denied.

*Mandamus denied.*

Separate opinion by Scholfield, C. J.:

I place my concurrence in the refusal to award a peremptory *mandamus* in this case on this ground only: A peremptory *mandamus* will never issue in favor of a private party, unless it shall be made to affirmatively appear that he will otherwise be deprived of something of substantial value to him. It will never be granted, however clear may be the abstract right, to settle a question to merely gratify vanity or curiosity, nor will it be granted if the application be made too late to give to the relator that which the relator asks. *The People* v. *Curyea,* 16 Ill. 547; *Christman* v. *Peck,* 90 id. 150; Tapping on Mandamus, 68, *16.

There is no allegation in this petition that the relator is desirous of again becoming a pupil in this university, and that if the writ shall be granted he will do so, and the facts stated in the petition authorize an inference to the contrary. They are, that he entered the university as a pupil in September,

1879, and remained a student therein until the 30th of April, 1885, when he was suspended, and that if he had remained in the university until the June immediately following his suspension, he would have graduated therefrom at that time. He shows that he acquiesced in that suspension by taking no legal steps to be restored until in March, 1890,—a period of almost five years,—when this petition was filed. If now really desirous of re-entering the university, to again, in good faith, resume his studies therein, he should have so stated.

Magruder, J.: I concur in the views expressed by Chief Justice Scholfield.