[Civ. No. 23556. First Dist., Div. Two. Feb. 28, 1967.]

ARTHUR L. GOLDBERG et al., Plaintiffs and Appellants, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendants and Respondents.

868

Garry, Dreyfus & McTernan and Donald L. A. Kerson for Plaintiffs and Appellants.

Thomas J. Cunningham, John P. Sparrow, Milton H. Gordon and Donald L. Reidhaar for Defendants and Respondents.

TAYLOR, J.—In this action, plaintiffs, Arthur L. Goldberg, Michael L. Klein, David A. Bills and Nicholas Zvegintzov (hereafter referred to by their last names), challenge, upon constitutional grounds, their suspension and dismissal from the University of California on April 20, 1965. This appeal is from a judgment of dismissal entered on an order sustaining the general demurrer of defendants, The Regents of the University of California (hereafter University), without leave to amend, to plaintiffs' petition for a writ of mandate seeking reinstatement to the University. Plaintiffs contend that their petition states a cause of action as the action of the University, through its disciplinary committee, was an unconstitutional limitation of their First Amendment rights, was taken pursuant to a constitutionally vague regulation, deprived them of procedural due process, and constituted an invasion of an area exclusively operated by state law. We have concluded that there is no merit in any of these contentions.

The basic facts are not in dispute. Until April 20, 1965, all plaintiffs were students in good standing at the Berkeley

campus[1] of the University of California. Each of them participated in a different manner in rallies held on March 4 and March 5 on the campus to protest the March 3 arrest of John Thomson (hereafter Thomson), a nonstudent who had displayed on campus a sign reading: "Fuck! Verb." Three of the plaintiffs (Goldberg, Klein and Bills) were also arrested and charged on March 4, 1965, with violations of the obscenity statutes (Pen. Code, §§ 311.2, 311.6) and disturbing the peace (Pen. Code, § 415) on the basis of the same facts that led to the University disciplinary proceedings. These criminal prosecutions were still pending on April 20, 1965.

On March 17, the Dean of Men wrote to each plaintiff that he had been charged with violating the University-wide policy on student conduct and discipline (as set forth below)[2] and quoted the pertinent portion of the General Catalogue of the Berkeley campus (quoted below).[3] The letters detailed the acts charged against each plaintiff (likewise set forth below).[4]

---

[1]Goldberg, Klein and Zvegintzov were graduate students; Bills (then a minor appearing through Patricia Surry, his guardian ad litem), an undergraduate student.

[2]"It is taken for granted that each student . . . will adhere to acceptable standards of personal conduct; and that all students . . . will set and observe among themselves proper standards of conduct and good taste. . . . This presumption in favor of the students . . . continues until, . . . by misconduct, it is reversed, in which case the University authorities will take such action as the particular occurrence judged in the light of the attendant circumstances, may seem to require. . . ."

[3]"The University authorities take it for granted that a student enters the University with an earnest purpose and will so conduct himself. Unbecoming behavior . . . will result in curtailment or withdrawal of the privileges or other action of the University authorities that they deem warranted by the student's conduct."

[4]Goldberg was charged with: having organized and participated in the March 4 rally held on the steps of Sproul Hall to protest the arrest of Thomson, acting as moderator for the rally and in the course thereof addressing the persons assembled by repeatedly using the word "fuck" in its various declensions; on Friday, March 5, with moderating and speaking at another rally conducted from the steps of the Student Union Building utilizing the terms "fuck, bastard, asshole and pissed off." Klein was charged with addressing the March 4 rally by using the word "fuck" in the course of his remarks; and on the same afternoon in Room 2 of Sproul Hall, repeatedly reading aloud several paragraphs from D. H. Lawrence's "Lady Chatterley's Lover" in which the term "fuck" appears. Bills was charged with acknowledging to University police officers that about 1:30 p.m. on March 4, he was manning a table at Bancroft and Telegraph for the purpose of raising money for the defense of Thomson; a container on the table was labeled "Fuck Fund"; also displayed was a large sign that Bills reportedly helped to prepare, reading: "Support the Fuck Defense Fund. Raise money for the bail and legal defense of John Thomson. Combat hypocrisy. Sponsored by Student

The letters informed plaintiffs that a special Ad Hoc Committee (hereafter Committee) had been appoined to hear the matter;[5] that plaintiffs might wish to obtain counsel to represent them at the hearing; and that they should plan to be present at a prehearing conference scheduled for the afternoon of Friday, March 19. Plaintiffs were not personally present at the prehearing conference but were represented by their attorney who raised several objections. The Committee considered and denied these objections, formulated the issues to be considered and procedures to be followed, and indicated that the hearings would begin on Monday, March 29. On Friday, March 26, the Committee was served with an alternative writ of prohibition issued by the Superior Court of Alameda County on behalf of Klein and Bills who were accordingly excluded from the March 29 hearings. The peremptory writ was denied and the temporary restraining orders were dissolved on Friday, April 2, and the hearing resumed as to all plaintiffs on Tuesday, April 6.

After unsuccessfully attempting to obtain a stipulation concerning the factual matters charged, the Committee held further hearings. At one of these hearings, plaintiffs' counsel took offense at something said and walked out, followed by plaintiffs. The hearings were continued and resumed on the evening of April 8, when plaintiffs were represented by another counsel as their original counsel was unavailable. Klein became dissatisfied with that representation and after making a short and polite statement of his reasons, withdrew. All later hearings were set for times convenient to plaintiffs' original counsel. The three plaintiffs present did not testify at the hearings but presented witnesses on their behalf. The final hearing was postponed until April 15 so that the Committee could hear the testimony of Lieutenant Chandler, who had made the arrests on March 4 and was personally present at all the events involved.

---

Committee for a Good Fuck.'' Zvegintzov was charged with participating in the March 4 rally by leading a yell or cheer consisting of first spelling and then shouting the word ''fuck.''

[5] This committee was specially appointed by the Acting Chancellor at the request of the then-existing Committees on Student Conduct and Student Political Activity and consisted of two members of each of the existing committees with a chairman selected from nominations submitted by the Berkeley Academic Senate's Committee on Committees. A student member was also added and participated in all hearings and meetings but did not vote on the final recommendations.

The Committee's findings of fact acknowledged that the substantial differences between the conduct of the four plaintiffs necessitated separate findings, but noted that the charges against each had been abundantly proved. The Committee concluded that plaintiffs had engaged in a clear pattern of planned and coordinated activity that had as one of its purposes a test of University reaction. The Committee also rejected the contention that the disciplinary hearings should not have proceeded as to Goldberg, Klein and Bills until their court cases were completed, reasoning that both for the good of the students and the University community, student disciplinary matters should be resolved as soon as practicable.

The Committee agreed unanimously that plaintiffs had committed the acts charged and concluded that their actions ''did constitute violations of the University's Regulations on Student Conduct and Discipline. [Quoted above, fn. 2.] Whether motivated by social protest or not, the members [of the Committee] agreed that the loud use and prominent display of the words in question in a public place such as the Sproul-Student Union Plaza is a violation of the regulation.''

Because of the substantial differences between the seriousness of the individual offenses, the Committee recommended different disciplinary measures as to each plaintiff. Goldberg was dismissed from the University, effective April 20. 1965; Klein and Zvegintzov were suspended until September 13, 1965; and Bills suspended until June 10, 1965.[6] The disciplinary actions were reviewed by the Acting Chancellor of the Berkeley campus and the President of the University, and on August 6, 1965, plaintiffs informed that there would be no interference with the discipline imposed.

██ Preliminarily, we note that mandate is the appropriate remedy in the instant case (*Munns* v. *Stenman,* 152 Cal.

---

[6]Although the record indicates that by the fall of 1965, the suspensions of Bills and Klein had expired while Goldberg was a student at Howard University Law School and Zvegintzov at the Carnegie Institute of Technology, no contentions concerning the mootness of these proceedings have been raised, nor can be. The dismissals and suspensions are on plaintiffs' academic records. Code of Civil Procedure section 1094.5, subdivision (f), provides, so far as pertinent: ''Where any final administrative order or decision is the subject of proceedings under this section, if the petition shall have been filed while the penalty imposed is in full force and effect the determination shall not be considered to have become moot in cases where the penalty imposed by the administrative agency has been completed or complied with during the pendency of such proceedings.'' (*Rattray* v. *Scudder,* 67 Cal.App.2d 123 [153 P.2d 433]).

App.2d 543 at 546 [314 P.2d 67] ; *Miller* v. *Dailey,* 136 Cal. 212 [68 P. 1029] ; Code Civ. Proc., § 1094.5). ■ As the appeal is from an order sustaining a general demurrer, we look only to the petition to determine whether, as a matter of law, a cause of action is stated on any theory (*McDonell* v. *American Trust Co.,* 130 Cal.App.2d 296 [279 P.2d 138] ). The answer, made a part of the record on appeal by the University, cannot be considered and is hereby stricken from the record (Cal. Rules of Court, rule 12).

■ Article IX, section 9 of the state Constitution, provides that the University of California shall constitute a public trust to be administered by the existing corporation known as The Regents of the University, with full powers of organization and government, subject only to such legislative control as may be necessary to insure compliance with the terms of the endowment of the University and the security of its funds. Accordingly, the University is a constitutional department or function of the state government (*Williams* v. *Wheeler,* 23 Cal.App. 619 [138 P. 937] ; *Newmarker* v. *Regents of University of Cal.,* 160 Cal.App.2d 640 [325 P.2d 558] ). The Regents have the general rule-making or policy-making power in regard to the University (*Estate of Royer,* 123 Cal. 614 [56 P. 461, 44 L.R.A. 364] ), and are (with exceptions not material here) fully empowered with respect to the organization and government of the University (*Williams* v. *Wheeler,* 23 Cal. App. 619 [138 P. 937] ; *Wallace* v. *Regents of University of Cal.,* 75 Cal.App. 274 [242 P. 892] ), including the authority to maintain order and decorum on the campus and the enforcement of the same by all appropriate means, including suspension or dismissal from the University. Pursuant to this authority, the previously quoted regulations concerning student conduct were adopted. Also pertinent are the particular resolutions set forth below.[7]

---

[7] "REGENTS RESOLUTION
November 20, 1964

"(a) The Regents restate the long-standing University policy as set forth in Regulation 25 on student conduct and discipline that 'all students and student organizations . . . obey the laws of the State and community. . . .'

"(b) The Regents adopt the policy effective immediately that certain campus facilities, carefully selected and properly regulated, may be used by students and staff for planning, implementing, raising funds or recruiting participants for lawful off-campus action, not for unlawful off-campus action."

The parties agree that the University's rule-making powers and its relationship with its students are subject to federal constitutional guarantees. Before discussing the contentions raised, we will briefly describe our approach to the application of these guarantees. The case is one of first impression in this state and requires the drawing of fine lines of demarcation between matters that involve the legitimate interests of the University and those that involve constitutionally protected rights.[8] The facts here presented relate to on-campus conduct expressing criticism and disapproval by highly visible and provocative means.

The more recent federal cases stress the importance of education to the individual and conclude that attendance in a state university is no longer considered a privilege as in *Hamilton* v. *Regents of University of Cal.* (1934) 293 U.S. 245 [79 L.Ed. 343, 55 S.Ct. 197],[9] but is now regarded as an important bene-

---

"'REGENTS RESOLUTION
December 18, 1964

"(a) The Regents direct the Administration to preserve law and order on the campuses of the University of California, and to take the necessary steps to insure orderly pursuit of its educational functions.

"(b) The Regents reconfirm that ultimate authority for student discipline within the University is constitutionally vested in The Regents, and is a matter not subject to negotiation. Implementation of disciplinary policies will continue to be delegated, as provided in the By-Laws and Standing Orders of The Regents, to the President and Chancellors, who will seek advice of appropriate faculty committees in individual cases.

"(c) The Regents will undertake a comprehensive review of University policies with the intent of providing maximum freedom on campus consistent with individual and group responsibility. A committee of Regents will be appointed to consult with students, faculty and other interested persons and to make recommendations to the Board.

"(d) Pending results of this study, existing rules will be enforced. The policies of The Regents do not contemplate that advocacy or content of speech shall be restricted beyond the purview of the First and Fourteenth Amendments to the Constitution.''

[8]We note that the problem presented has recently been the subject of many thoughtful comments (see the Bibliography on Student Rights and Campus Rules, 54 Cal. L.Rev., 177). For help in our analysis, we are particularly indebted to the symposium on the subject in this volume of the California Law Review and wish to commend the publication for such an outstanding collection of viewpoints on such a timely subject.

[9]In *Abington School Dist.* v. *Schempp*, 374 U.S. 203 [10 L.Ed.2d 844, 83 S.Ct. 1560], the concurring opinion of Justice Brennan at page 251, so noted and pointed out that while *Hamilton* has not been overruled, the cases on which it relied have been. The development of the constitutional concepts of substantive due process, equal protection and unconstitutional conditions in the years since *Hamilton* has been ably discussed elsewhere. See W. W. Van Alstyne, *Student Academic Freedom and the Rule-Making Powers of Public Universities: Some Constitutional Considerations*, 2 Law In Transition Quarterly 1; H. A. Linde, *Constitutional Rights in the Public Sector*, 40 Washington Law Review 10.

fit.[10] (*Dixon* v. *Alabama State Board of Education* (1961) 294 F.2d 150, cert. denied 368 U.S. 930 [7 L.Ed.2d 193, 82 S.Ct. 368]; *Knight* v. *State Board of Education* (1961) 200 F.Supp. 174.)

In the *Dixon* and *Knight* cases, it was held that procedural due process required a hearing before students who participated in demonstrations violating laws concerning the separation of the races in public places could be dismissed or suspended from the state university. As stated in *Dixon*: ''The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing. It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens.'' (P. 157.) The court noted in *Knight* that: ''Whether the interest involved be described as a right or a privilege, the fact remains that it is an interest of almost incalculable value, especially to those students who have already enrolled in the institution and begun the pursuit of their college training. Private interests are to be evaluated under the due process clause of the Fourteenth Amendment, not in terms of labels or fictions, but in terms of their true significance and worth.'' (P. 178.)

██ For constitutional purposes, the better approach, as indicated in *Dixon*, recognizes that state universities should no longer stand in loco parentis in relation to their students.[11]

---

[10]In *Brown* v. *Board of Education*, 347 U.S. 483, the court said at page 493 [98 L.Ed 873, 74 S.Ct. 686, 38 A.L.R.2d 1180]: ''Today, education is perhaps the most important function of state and local governments.'' Other recent cases have indicated that university professors cannot be arbitrarily dismissed on the privilege theory (*Slochower* v. *Board of Education*, 350 U.S. 551, 555 [100 L.Ed. 692, 76 S.Ct. 637]; *Wieman* v. *Updegraff*, 344 U.S. 183, 192 [97 L.Ed. 216, 73 S.Ct. 215]).

[11]The classic case applying the loco parentis approach is *Anthony* v. *Syracuse University* (1928) 224 App.Div. 487 [231 N.Y.Supp. 435]; but see also *North* v. *Board of Trustees* (1891) 137 Ill. 296 [27 N.E. 54]; *Gott* v. *Berea College*, 156 Ky. 376 [161 S.W. 204]; *Stetson University* v. *Hunt* (1924) 88 Fla. 510 [102 So. 637]. Some recent cases have also followed the doctrine. See *Carr* v. *St. John's University* (1962) 34 Misc. 2d 319 [231 N.Y.S.2d 403]; *Steier* v. *New York State Education Comr.*, 271 F.2d 13; *Due* v. *Florida Agr. & Mechanical University* (1963) 233 F.Supp. 396. In earlier decades in loco parentis had some superficial appeal because the vast majority of college students were below 18. Today, in contrast, there are more students between the ages of 30 and 35

Rather, attendance at publicly financed institutions of higher education should be regarded a benefit somewhat analogous to that of public employment.[12] Accordingly, we deal with the question here presented within the same constitutional framework as that applied in the recent public employment cases (*Bagley* v. *Washington Township Hospital Dist.*, 65 Cal.2d 499, 504 [55 Cal.Rptr. 401, 421 P.2d 409]; *Fort* v. *Civil Service Com.*, 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385]). The test is whether conditions annexed to the benefit reasonably tend to further the purposes sought by conferment of that benefit and whether the utility of imposing the conditions manifestly outweighs any resulting impairment of constitutional rights.

 Plaintiffs first contend that they were engaged in the exercise of their First Amendment rights of free speech[13] and assembly in protesting the arrest of Thomson, and that the University's disciplinary action taken as the result of their conduct on March 4 or March 5 constituted a denial of these rights. Their argument has as its major unarticulated

in universities than there are those under 18, and the latter group account for only 7 percent of the total college enrollment (54 Cal. L.Rev. 28, fn. 13). See also Rosemary Park, Alma Mater, Emerita in The University in America, An Occasional Paper on the Role of Education in the Free Society, Center for Democratic Institutions (1967). The United States Supreme Court's observation in *Brown* v. *Board of Education*, *supra*, page 493, concerning the field of primary education that "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education" is equally applicable today to the university level. Apart from the values of a university education to the individual and to society, its significance in this state is reflected in the spectacular increase in enrollment in our public universities in the last decade and the commensurate rise of state and federal support.

[12]In the cases dealing with public employment, there has also been a change from no constitutional right to public employment (*McAuliffe* v. *New Bedford*, 155 Mass. 216 [29 N.E. 517]) to a recognition that the power of government to withhold benefits from its citizens does not encompass a supposed "lesser" power to grant such benefits upon an arbitrary deprivation of constitutional rights (*Bagley* v. *Washington Township Hospital Dist.*, 65 Cal.2d 499, 504 [55 Cal.Rptr. 401, 421 P.2d 409]).

[13]Plaintiffs erroneously contend that their dismissal was based on their use of obscene language and that the standards used to determine obscenity did not conform to constitutional requirements. The University (relying on its answer) compounds the error by arguing that plaintiffs were subsequently convicted of using obscene language which is not within the purview of constitutionally protected speech. However, as we have indicated above, the question is whether in detrmining that plaintiffs should be disciplined for the manner in which they exercised their rights, the University imposed any unconstitutional conditions on plaintiffs' continued attendance at the University.

premise that since their purpose was to protest, they had a constitutional right to do so whenever, however, and wherever they pleased. That concept of constitutional law was vigorously and forthrightfully rejected by the United States Supreme Court in *Adderley* v. *Florida* (Nov. 14, 1966) (385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242] ; *Cox* v. *Louisiana,* 379 U.S. 536, 554-555 [13 L.Ed.2d 471, 85 S.Ct. 453] ; *Cox* v. *Louisiana,* 379 U.S. 559, 563-574 [13 L.Ed.2d 487, 85 S.Ct. 476]. These cases recognize that it is not enough for the plaintiffs to assert they are exercising a "right" to claim absolute immunity against any form of social control or discipline, for it is well recognized that individual freedoms and group interests can and do clash (*Time, Inc.* v. *Hill* (Jan. 9, 1967) 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534]). An individual cannot escape from social constraint merely by asserting that he is engaged in political talk or action (*New York Times Co.* v. *Sullivan,* 376 U.S. 254, 265-266 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]).

The applicable principles were stated in *Konigsberg* v. *State Bar,* 366 U.S. 36 at pages 49-51 [6 L.Ed.2d 105, 81 S.Ct. 997] : "Throughout its history this Court has consistently recognized at least two ways in which constitutionally protected freedom of speech is narrower than an unlimited license to talk. On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection. See, e.g., *Schenck* v. *United States,* 249 U.S. 47 [63 L.Ed. 470, 39 S.Ct. 247] ; *Chaplinsky* v. *New Hampshire,* 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766] ; *Dennis* v. *United States,* 341 U.S. 494 [95 L.Ed. 1137, 71 S.Ct. 857] ; *Beauharnais* v. *Illinois,* 343 U.S. 250 [96 L.Ed. 919, 72 S.Ct. 725] ; *Yates* v. *United States,* 354 U.S. 298 [1 L.Ed.2d 1356, 77 S.Ct. 1064] ; *Roth* v. *United States,* 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304]. *On the other hand, general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved."* (Italics added.)

Thus, reasonable restrictions on the freedoms of speech and assembly are recognized in relation to public agencies that

have a valid interest in maintaining good order and proper decorum (*American Civil Liberties Union* v. *Board of Education*, 59 Cal.2d 203, 212 [28 Cal.Rptr. 700, 379 P.2d 4]). Conduct, even though intertwined with expression and association, is subject to regulation (*Adderley* v. *Florida*; *Cox* v. *Louisiana, supra*). As the purposes and functions of a public university are markedly different from the public institutions involved in the cases mentioned above, we must examine the interest the University was protecting in disciplining the plaintiffs.

■ Broadly stated, the function of the University is to impart learning and to advance the boundaries of knowledge. This carries with it the administrative responsibility to control and regulate that conduct and behavior of the students which tends to impede, obstruct or threaten the achievements of its educational goals. Thus, the University has the power to formulate and enforce rules of student conduct that are appropriate and necessary to the maintenance of order and propriety, considering the accepted norms of social behavior in the community, where such rules are reasonably necessary to further the University's educational goals.

Unquestionably, the achievement of the University's educational goals would preclude regulations unduly restricting the freedom of students to express themselves.[14] As stated in *Edwards* v. *South Carolina*, 372 U.S. 229, 237 [9 L.Ed.2d 697, 83 S.Ct. 680] : " '[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.' "

---

[14]As so aptly put in *Sweezy* v. *New Hampshire*, 354 U.S. 234, 250 [1 L.Ed.2d 1311, 77 S.Ct. 1203] : "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

Historically, the academic community has been unique in having its own standards, rewards and punishments. Its members have been allowed to go about their business of teaching and learning largely free of outside interference. To compel such a community to recognize and enforce precisely the same standards and penalties that prevail in the broader social community would serve neither the special needs and interests of the educational institutions, nor the ultimate advantages that society derives therefrom. Thus, in an academic community, greater freedoms and greater restrictions may prevail than in society at large, and the subtle fixing of these limits should, in a large measure, be left to the educational institution itself.

The question here is whether the University's requirement that plaintiffs conform to the community's accepted norms of propriety with respect to the loud, repeated public use of certain terms was reasonably necessary in furthering the University's educational goals. We note that plaintiffs were not disciplined for protesting the arrest of Thomson, but for doing so in a particular manner. The qualification imposed was simply that plaintiffs refrain from repeatedly, loudly and publicly using certain terms which, when so used, clearly infringed on the minimum standard of propriety and the accepted norm of public behavior of both the academic community and the broader social community. Plaintiffs' contention that the words were used only in the context of their demonstration is not borne out by the record which indicates that the terms were used repeatedly, and often out of context, or when used in context given undue emphasis. The conduct of plaintiffs thus amounted to coercion rather than persuasion.

The association with an educational institution as a student requires certain minimum standards of propriety in conduct to insure that the educational functions of the institution can be pursued in an orderly and reasonable manner. The limitation here imposed was necessary for the orderly conduct of demonstrations, not unlike reasonable restrictions on the use of loudspeakers (*Kovacs* v. *Cooper*, 336 U.S. 77 [93 L.Ed. 513, 69 S.Ct. 448, 10 A.L.R.2d 608]). The irresponsible activity of plaintiffs seriously interfered with the University's interest in preserving proper decorum in campus assemblages (cf. *Bagley* v. *Washington Township Hospital Dist.*, *supra*, p. 507). Conduct involving rowdiness, rioting, the destruction of property, the reckless display of impropriety or any

unjustifiable disturbance of the public order on or off campus is indefensible whether it is incident to an athletic event, the advent of spring, or devotion, however sincere, to some cause or ideal.

We hold that in this case, the University's disciplinary action was a proper exercise of its inherent general powers to maintain order on the campus and to exclude therefrom those who are detrimental to its well being (*Morris* v. *Nowotny* (Tex.Civ.App. 1959) 323 S.W.2d 301, cert. denied 361 U.S. 889 [4 L.Ed.2d 124, 80 S.Ct. 164]). Thus, for the purposes of this appeal, it is not necessary to discuss plaintiffs' contention that any particular regulation was unconstitutionally vague.

■ Plaintiffs next contend that the procedure adopted by the University deprived them of procedural due process. This contention is refuted by the report of the Committee. As indicated above, the leading case of *Dixon, supra,* at page 157, held that in the disciplining of college students, there are no considerations of immediate danger to the public or of peril to the national security that would prevent the college authorities from exercising at least the fundamental principles of fairness by giving the accused students notice of the charges and an opportunity to be heard in their own defense. The case set forth certain basic requirements but also noted that procedures for dismissing college students were not analogous to criminal proceedings and could not be so without at the same time being both impractical and detrimental to the educational atmosphere and functions of a university.

The court in *Dixon* demanded compliance with the following standards: (1) a notice containing a statement of the specific charges and grounds which, if proven, would justify expulsion under the applicable regulations of the University; (2) a hearing whose scope and nature should vary according to the circumstances of the particular case. The court noted that where the student misconduct (as opposed to failure to meet academic standards) depended on a collection of facts easily colored by the point of view of various witnesses (as here), there should be a hearing with an opportunity to hear both sides. However, it was made clear that a full dress judicial hearing with the right to cross-examine witnesses was not required as such a hearing, with the attending publicity and disturbance of University activities, might be detrimental to

the educational atmosphere of the University and impractical to carry out.

*Dixon* also emphasized that the rudiments of an adversary proceeding could be had without encroaching on the interests of the educational institution; that the students should be given the names of the witnesses against them in an oral or written report on the facts to which each witness testified, as well as an opportunity to present his own defense and to produce either oral testimony or written affidavits of witnesses on his behalf. As to whether the hearing was to be open or closed, the court likewise left this to the discretion of the University, depending on the nature of the offense (294 F.2d 150 at pp. 158-159).

The hearing provided to plaintiffs more than adequately complied with the *Dixon* standards.[15] In *Due* v. *Florida Agr. & Mechanical University, supra,* notice and hearing procedures far less formal and stringent than those afforded to plaintiffs were held to have met the *Dixon* requirements. Here, plaintiffs received a proper advance notice of the hearing specifying the particular charges and suggesting that they might wish to obtain counsel. Prior to the hearings, the Committee formulated the issues and applicable rules of evidence and gave plaintiffs the opportunity to object. Plaintiffs were represented by counsel and given ample opportunity to hear and observe the witnesses against them and to present their own defense. The Committee applied the presumption in favor of the students required by the University's regulation on student conduct and discipline.

The record is replete with plaintiffs' refusal to cooperate, rudeness and contempt of the Committee and its procedures and hearings. The Committee, fully aware of its responsibilities, generally ignored plaintiffs' behavior and adjusted its proceedings to the convenience of plaintiffs and their counsel as much as possible. The record indicates that despite the attitude and behavior of plaintiffs and their counsel, the Committee retained its calmness and objectivity and made every effort to conduct its hearings at a time most convenient to plaintiffs and their counsel.

---

[15]The record indicates that the Committee was aware of the *Dixon* standard and wished to follow it. We note that the procedures here followed approximate those recommended by the American Civil Liberties Union and approved by the American Association of University Professors (see W. W. Van Alstyne, *Procedural Due Process and State University Students,* 10 U.C.L.A. L.Rev., 368, 386).

■ We turn next to plaintiffs' contentions that they were deprived of procedural due process in two other respects, the procedures and rules of evidence adopted and the alleged prejudice of administrative authorities that reviewed the Committee's recommendations. The Committee adopted certain procedures and rules of evidence at the outset[16] and ruled on plaintiffs' objections thereto. The hearings were open. As indicated above, a student was appointed to the Committee and participated in all the proceedings except the final disciplinary recommendations.

Clearly, there is no merit in the contention that plaintiffs were deprived of procedural due process because the Committee did not follow the rules of evidence usually applicable in judicial proceedings and chose not to recognize the privilege against self-incrimination. The Committee heard a number of witnesses on both sides. Plaintiffs did not testify but presented witnesses on their own behalf and were given the opportunity to cross-examine the University's witnesses. The Com-

---

[16]"A. *Issues to be decided*

"1. Did each of the students involved commit the acts with which he is charged?

"2. If the answer to Question No. 1 is Yes was such conduct a violation of 'acceptable standards of personal conduct' or 'proper standards of conduct and good taste?'

"3. If the acts are found to have been committed, and are also found to constitute a violation of the charges, were there any 'attendant circumstances' shown in mitigation?

"4. Relating to the nature of the discipline, if any, to be recommended, the Committee will hear evidence showing what sanctions have been imposed by the University in prior cases involving misconduct of a nature similar to that here charged.

"B. *Form of evidence to be presented*

"1. Where feasible, the Committee prefers to receive evidence in the form of written statements of the events as perceived by witnesses. Clarifying questions may be addressed by Committee members on their own initiative or at the suggestion of representatives of the University or of the students charged with violations.

"2. The Committee requests the University and the students to prepare written statements embodying accounts of the events.

"3. Members of the Committee will draw upon their own knowledge of acceptable standards of conduct and good taste in the University community. Written presentations relating to these standards will be received and considered by the Committee, if determined to be relevant. Presentations on this subject may be received within an agreed time after termination of formal hearings, if the students are, for good cause, unable to submit such statements at the hearing.

"4. Evidence of prevailing standards of conduct and good taste in the University community will be considered only as it bears upon proof of violation. It will not be considered as evidence that the regulation is unconstitutional or otherwise invalid, a question on which the Committee previously has ruled that it will not pass.''

mittee indicated an awareness that at times it was listening to hearsay evidence and weighed it as such. Klein, after being duly warned by a member of the Committee that he was not under duress and that no decision had been reached as to whether questions would be addressed to plaintiffs, chose to admit his guilt. However, the Committee did not base its findings on his admission but on the facts as related by the other witnesses. As to Zvegintzov, the Committee properly rejected the evidence of the unidentified informer and properly refused to recognize any general rule that a person subject to University disciplinary proceedings can refuse to answer questions under any and all circumstances.

Plaintiffs argue that the proceedings deprived them of procedural due process because the University suppressed certain evidence which would have permitted the Committee to hear the language used in the context of the whole rally. The record indicates that the University had in its possession a tape recording (described as indistinct and often unintelligible) of some or all of the March 4 rally. The Committee initially asked to hear the tape but was not permitted to because of restrictions on its use imposed by the district attorney's office which was prosecuting plaintiffs on the charges for which they had been arrested. Subsequently, the Committee abandoned its efforts to obtain the tape as it felt that the testimony and statements of the other witnesses had provided a sufficient picture of the context of the rally. Assuming the tape to be intelligible, it was no doubt the best evidence available. However, as indicated in *Dixon, supra*, the Committee was not required to proceed in the same manner as a formal judicial proceeding. We conclude that under the circumstances, the Committee's failure to hear the tape did not in any way infringe on plaintiffs' rights to procedural due process.

Plaintiffs further contend that they were denied procedural due process because certain newspaper articles (incorporated in the petition) quoting the President of the University and the Acting Chancellor of the Berkeley campus, who reviewed the disciplinary action, indicate that their cases had been prejudged. This argument is preposterous. The newspaper articles simply indicate that the conduct described had occurred on the campus and the personal reactions of these administrative officers to this type of conduct. The Committee's careful procedures and evaluations of the evidence

and thorough findings, along with the final differences of opinion among its members reflected by their various recommendations concerning the discipline appropriate to each plaintiff, evidence its fairness. The record indicates that the administrative officers of the University accepted, without modification, the recommendations of the Committee as to the discipline to be imposed.

Rather than indicating any bias, we note that one newspaper article indicates that the Acting Chancellor and President of the University rejected the demands for summary and immediate dismissals of plaintiffs made by some other University officials. Both subsequently submitted their resignations unless the orderly disciplinary procedures of the University were allowed to proceed. Thus, the record indicates that whatever their personal reactions were to the type of conduct here involved, the Acting Chancellor and President of the University did everything in their power to perfect and assure plaintiffs' rights of procedural due process.

Finally, plaintiffs argue that they were deprived of procedure due process[17] because the University proceeded with its disciplinary hearings and actions before the final termination of the off-campus formal judicial proceedings relating to their arrest for the same acts. While recognizing that the disciplinary measures that were imposed may have a very serious effect upon the careers of the individual plaintiffs,[18] the disciplinary measures, as we have indicated above, amounted to a denial of a benefit and can by no stretch of the imagination be classified as criminal proceedings. Furthermore, we cannot accept the contention that where certain conduct is violative of both the rules and regulations of the University and the statutes of the state that the discipline imposed by the academic community must wait the outcome of the other proceedings.

As we have previously indicated, the University, as an academic community, can formulate its own standards, rewards and punishments to achieve its educational objectives. In this context, violations of certain rules of the outside community (parking, for example) are of little significance to the Uni-

---

[17]In plaintiffs' mistaken conception of the issues previously noted, they characterize this question as one of obscenity laws fully occupied by state law.

[18]See W. A. Seavey, *Dismissal of Students: "Due Process,"* 70 Harvard Law Review, 1406-1407.

versity's functions and objectives. Similarly, certain conduct that violates no laws of the external community, such as cheating on an examination, is properly proscribed by and disciplined by the University as it interferes with the University's basic educational purpose. Thus, except for the applicable constitutional limitations, the relationship between appropriate University rules and laws of the outside community is entirely coincidental. The validity of one does not establish the validity of the other.

As indicated above, we have determined here that the Committee was operating properly within constitutional limitations. Its recognition of the interest of the academic community in resolving its disciplinary matters swiftly does not invade any area occupied by state law. As noted in *Dixon, supra,* any other approach would be highly impractical[19] and inconsistent with the functions of an educational institution.

We conclude, upon the application of all pertinent constitutional requirements, that plaintiffs' complaint does not state a cause of action on any theory.

The answer is stricken from the record and the judgment is affirmed.

Agee, Acting P. J., and Bray, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 26, 1967.

---

[19]For instance, here, the criminal proceedings against plaintiffs would not be finally determined in the legal sense until all the appeals to higher courts were completed, a matter of years.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.