Chester Ray MORRIS, Appellant,

v.

Arno NOWOTNY et al., Appellees.

No. 10645.

Court of Civil Appeals of Texas.
Austin.

March 26, 1959.

Rehearing Denied April 15, 1959.

Chester R. Morris per se.

Will Wilson, Atty. Gen., Leonard Passmore, Asst. Atty. Gen., Q. C. Taylor, Kerns B. Taylor, Graves, Dougherty & Gee, Austin, for appellees.

HUGHES, Justice.

Appellant Chester Ray Morris sued the University of Texas, Arno Nowotny, Dean of Student Life, Carl Bredt, Associate Dean of Student Life, Dr. Paul White, Director of the Student Health Center, Dr. Anthony P. Rousos, a member of the medical staff of the Student Health Center, all University of Texas employees, and the Honorable Tom E. Johnson, County Judge of Travis County, " * * * for punitive and exemplary damages for the sum of two hundred thousand ($200,000.00) and costs of suit * * *" for "false imprisonment, false arrest, libel, violation of civil rights and for being falsely barred from readmission to the University of Texas."

The Trial Court sustained a motion for summary judgment filed in behalf of Judge Tom E. Johnson and a plea in abatement filed by the University and its employees. Judgment was rendered that appellant "take nothing" as to Judge Johnson and that the University and its named employees "go hence without day."

Appellant has not appealed from the judgment in favor of the University of Texas.

Appellant is not an attorney and he is not represented by counsel herein. All pleadings and briefs of appellant referred to herein were signed by him and by him alone.

We will notice first the action of the Trial Court in rendering summary judgment for Judge Johnson and in so doing we will quote or state the substance of the pleadings as to him.

Appellant plead that while he was in the Travis County jail he was visited by Judge Johnson, Dean Nowotny and Doctors Rousos and White and, we quote from his petition:

"At the conclusion of the visit defendant Johnson said, 'I guess you don't know me, Chester, I am Judge Johnson. It is thought that you should be sent to Austin State Hospital for a period of observation not to exceed ninety days and let them see if they can find anything wrong with you.' Then he turns to defendants Rousos and White and says, 'You gentlemen think he should be sent to Austin State Hospital for observation'. They both shook their heads. 'Oh, Yes'."

Again we quote the pleading regarding Judge Johnson:

"Defendant Tom E. Johnson did deliberately, maliciously, willingly and knowingly fail to give the plaintiff a fair trial. If defendant Johnson knew why he was asked to make his decision, he received such information in private. The plaintiff never appeared before the judge, defendant Johnson in the court room.

" * * * The plaintiff found a paper signed by defendants, Paul White, Anthony P. Rousos and Tom E. Johnson entitled, 'Testimony—Mental Ill-

ness.' The paper helped to commit plaintiff to Austin State Hospital."

Appellant alleged that he was arrested January 31, 1956, taken to the Austin State Hospital February 2, 1956 and dismissed March 15, 1956. He also alleged that this confinement was without due process of law and constituted false imprisonment.[1]

Judge Johnson in his motion for summary judgment alleged that he acted solely in his capacity as County Judge of Travis County in the matters about which appellant complains. We quote from his motion:

"Heretofore on the 31st day of January 1956, an Information was duly executed under oath by L. C. Stromquist, was filed with the County Clerk of Travis County, Texas and was brought to the attention of this defendant as County Judge of Travis County. A certified copy of said Information is hereto attached and made a part of this motion. Whereupon on February 1, 1956 this defendant in his official capacity as aforesaid entered an order in Cause No. 1801 entitled 'In the Matter of Chester R. Morris, Mental Illness,' in the County Court of Travis County, Texas, ordering that a hearing on said matter be held in the Travis County Court House at 4:30 P.M. on February 1, 1956, and directing that the Clerk issue to the said Chester R. Morris a notice of said hearing as provided by law. A hearing was held pursuant to the above order in the Travis County Court House at the appointed hour on February 1, 1956. At said hearing two reputable physicians authorized by

law to practice medicine in the State of Texas, neither of whom is on the staff of any Texas State Hospital, and each of whom had examined the said Chester R. Morris within the preceding five days of said hearing, gave testimony under oath as stated in Exhibit 'B' attached hereto and made a part of this motion.

"III

"At the conclusion of said hearing this defendant, in his capacity as County Judge of Travis County, entered an order in said Cause No. 1801 temporarily committing the said Chester R. Morris to the Austin State Hospital as authorized by law. A certified copy of said order of temporary commital is hereto attached, marked Exhibit 'C' and is made a part of this motion.

"IV

"This defendant further says that all actions taken by this defendant concerning the matters referred to in plaintiff's petition were taken by him in obedience to what this defendant, in his judicial capacity, conceived to be required by the applicable law of the State of Texas, particularly House Bill 126, of the 45th Legislature, approved May 5, 1937; Acts of 1937, 45 Legislature, pages 542–545, Chapter 268, also known as Article 3193o-1, Vernon's Civil Statutes of Texas, Annotated."

We will not copy the exhibits referred to by Judge Johnson since no objection has been raised as to their sufficiency in form. We will say that we have examined such

---

1. Appellant filed an instrument denominated "Plaintiff's First Amended Petition" in which additional allegations are made regarding all appellees. This instrument does not purport to be a complete pleading and is very brief. If we held it to be an amended petition appellant would be deprived of most of his allegations since an amended petition supersedes the petition amended. Rules 64, 65, Texas Rules of Civil Procedure. In view of this we have concluded to treat "Plaintiff's First Amended Petition" as an invalid attempt to amend the original petition. We are not bound by the style given a pleading. Rule 71, T.R.C.P. Since the attempted amendment is invalid we ignore any allegations contained in it.

exhibits and that they appear to be regular and valid in all respects. We also note that the doctors executing the affidavit referred to by Judge Johnson were appellees Doctors White and Rousos.

We quote, in full, appellant's answer to Judge Johnson's motion for summary judgment:

"The plaintiff never received the Notice of Hearing to be held in the court room of the Travis County Courthouse at 4:30 PM, February 1, 1956, which defendant Tom E. Johnson alleges he directed the clerk issue to the plaintiff. The plaintiff could have easily been served with notice of hearing since he was confined in jail at Travis County Courthouse on February 1, 1956.

"II

"The plaintiff was not present at said hearing if any in the court room of the Travis County Courthouse at 4:30 . PM, February 1, 1956, nor was he represented by counsel.

"III

"The visit of defendants Johnson, Nowotny, Rousos and White to the plaintiff at his cell on February 1, 1956 did not constitute a legal hearing and did not constitue court."

■ Judge Johnson asserted and the record conclusively shows that in all matters relating to appellant and about which he complains that he, Judge Johnson, was acting in a judicial capacity and under the authority specifically conferred upon him as County Judge by Art. 3193o–1, V.A.C.S., repealed by Acts 1957, 55th Leg. p. 505, relating to the temporary commitment of persons thought to be mentally ill.

■ That there may or may not have been procedural errors in the commitment of appellant is not material in this case. A judge is simply not civilly responsible in damages for his errors or mistakes. As to this the law has long been well settled. The general rule is stated in 25 Tex.Jur. p. 254, as follows:

"Under the broad principles applicable to public officers generally, a judge is not civilly liable for acts performed in the exercise of his judicial functions, even though they were wilful or malicious."

The first case decided by our courts involving this question was Rains v. Simpson, 1878, 50 Tex. 495, where an elaborate discussion is found. The court there quoted from Chief Justice Kent writing in Yates v. Lansing, 5 Johns., N.Y., 282; in, part, as follows:

"Whenever we subject the established courts of the land to the degradation of a private prosecution, we subdue their independence and destroy their authority. Instead of being venerable before the public, they become contemptible; and we thereby embolden the licentious to trample upon everything sacred in society, and to overturn those institutions which have hitherto been deemed the best guardians of civil liberty."

The latest case noticed on this subject is Griffin v. Connally, D.C.S.D.Tex., 1955, 127 F.Supp. 203. This case is in accord with these principles.

We entertain no doubt but that the summary judgment in favor of Judge Johnson was properly rendered.

We now undertake to summarize or quote from appellant's petition its allegations which relate to Doctors White and Rousos and Deans Nowotny and Bredt:

"On January 31, 1956, defendant Carl Bredt, stating that he was acting under instructions from defendant Arno Nowotny, did order plaintiff to stay off the property of the University of Texas. This was ordering the plaintiff to stay off state property at times of the day

when this property was supposed to be open to the public. Defendant Carl Bredt gave plaintiff no reason for his request to stay off University property. When plaintiff did refuse to obey orders, defendant Carl Bredt did have two University of Texas police arrest plaintiff in less than 15 minutes after he left defendant Bredt's office. The police carried plaintiff to defendant Bredt who says, 'I told you to stay off University property.' The plaintiff replied, 'I told you I was not going to do it.' The plaintiff was later accused of trying to fight. This was not true. The plaintiff was making gestures."

After pleading that he was placed in jail appellant alleged:

"The plaintiff was given solitary confinement at the court house jail. This also served to keep the arrest of the plaintiff a secret and prevent him from receiving assistance. Defendant Paul White pretended to be a friend of the plaintiff and visited the plaintiff at the court house jail. The purpose of the visit was a medical examination which the plaintiff did not realize at the time. Later defendant Arno Nowotny, Anthony P. Rousos, Paul White and Tom E. Johnson visited plaintiff at his cell unannounced."

Pleading further he alleged:

"Defendant Anthony P. Rousos has stated in public the objectives of the defendants to see that the plaintiff never has another job for the rest of his life. Defendant Rousos presided over a staff meeting, a room full of people at Austin State Hospital on March 1, 1956. He said, 'Can your people support you for the rest of your life.' I says, 'No they cant.' He says, 'You will never get another job. You might get one but you wont hold it. You will never hold another job.' One of the officers who arrested the plaintiff expressed the same objective when he said, 'They do not want to recommend

you for any type of job.' Since that time they have not prevented the plaintiff from receiving job offers but they have prevented him from going on the payroll. Offers have been withdrawn and contract revoked. Since November 16, 1955 the plaintiff has contacted more than 700 employers, many of them two or more times. * * * Since the plaintiff did find false medical information in the records at the Travis County Courthouse, he assumes that the decision of the Civil Service Commission is based on false medical information received from Travis County originating from one or more of the defendants."

Regarding Dean Nowotny we find these allegations:

"Defendant Arno Nowotny did attempt to use the powers of his office to deny the right of the plaintiff to have and express an opinion. Defendant Nowotny did try to use the powers of his office to interfere with freedom of relegion. Defendant Nowotny did not like for the plaintiff to express his views in Texas. The belief which defendant Nowotny did not like for the plaintiff to express and differed so strongly is this. The plaintiff believes it is wrong for a man to be jealous of a woman or for a woman to be jealous of a man. The plaintiff believes it is wrong for anyone to possess a type mind such that their jealousy can be aroused. The plaintiff never has asked any woman to leave other men alone and God be with him and he never will. The plaintiff cannot remember when he did not have this belief. Understand the plaintiff does not question the right of a man to object to another man having relations with his wife. What the plaintiff questions is the right of a man to be jealous of someone who is innocent. The plaintiff has advocated this belief a long time. There have been people who differed with the plaintiff. They would say the plain-

tiff did not know what love is, that the plaintiff never had been in love. They would say that the only person who could possibly possess such a belief would be a person who had never been in love. People would make those same type of remarks who had never heard of one another. The plaintiff has even heard this remark made, 'What it is that is wrong with the man is not that he is crazy. What it is that is wrong with the man is that he has never been in love.' The plaintiff quotes these remarks but does not approve them. The plaintiff considers that the only thing worse than being jealous is taking advantage of someone who is not. Before anyone objects too strongly to the plaintiff's belief they should think about this fact. If a man wants a woman to desert her husband, then that man is jealous. If a woman wants a man to desert his wife, then that woman is jealous. The plaintiff considers that he has a duty to the Lord to teach people that it is wrong to get jealous. The plaintiff's life long attitude towards jealous women is this. If a single woman is jealous, leave her alone, not the other girls she wants you to leave alone. If a married woman married to another man and living with him is jealous, nothing to worry about. If she wants you to talk to no girls but her, just say alright and be talking to another in five minutes, nothing she can do about it. * * * Defendant Nowotny objected to the plaintiff fighting for a cause. The dean objected to the plaintiff fighting for what he considered to be right. Defendant Nowotny objected to the plaintiff making a moral fight."

It is alleged that Dean Nowotny filled in the underscored words on an unsigned paper found in the Travis County Courthouse records. We quote that part of the paper to which appellant refers:

"19. Have there been previous attacks? If so give history of these, the duration and age which they occurred. Pre-senility.

"(a) Describe the symptoms that were noticed indicating that something was wrong with patient's mind.

"During the summer of 1955 complaints were made about his telephoning to Mr. * * * repeatedly and early each morning. Complaint by Dean of Graduate School at University that Mr. Morris was making a nuisance of himself around the secretaries and also disturbed them at home.

"(b) When did they begin? June 1955

"(c) Did they improve or get steadily worse? worse

"(e) Mention things that patient said or did that were unusual for him. He wrote letters to Mrs. * * * that indicated childish sexual advances."

Regarding the contents of this paper appellant pleaded:

"Nothing that could be described as presenility happened to the plaintiff while he was a resident of Travis County, Texas. However the symptoms of a testicle injury at age 5 might be confused with the symptoms of presenility. Very little is left of the plaintiff's left testicle. The weaker sex urges thereby caused is compensated for by a desire play the part of a fake wolfe, and conceal this sex weakness. The plaintiff always considered it a compliment for someone to call him a wolfe and an insult if anyone said he did not care anything about the girls. The testicle injury probably caused a life long adolescence development which may have caused

the plaintiff to assume for the first time some of the ways of a boy 20 but these were not the ways of the plaintiff at 20.

"20. (a) The plaintiff was making a fight for a cause. The good book says, 'Go ye forth and preach the gospel.' The plaintiff felt a duty to the Lord to teach * * * it was wrong to get jealous. . The plaintiff preached his views to * * * by telephone. Some of the conversations were early in the morning, some were early in the evening, at various times of the day.

"The plaintiff visited the secretaries at the graduate school office for periods of less than five minutes at a time. They indicated they were glad to have the plaintiff visit them. Ordinarily he was returning home from a class. The plaintiff expressed no interest in them and only talked to them. In March 1955 Dr. Whaley wrote the plaintiff a letter asking the plaintiff to come to his office. He wanted to discuss the plaintiff's grades for the previous semester. Dr. Whaley requested that the plaintiff stop visiting the secretaries at the office which the plaintiff did in spite of his conviction that the only person who has a right to ask him to stop talking to any girl he pleases is that girl herself. He claimed that the visits interfered with their work."

Regarding the letters appellant alleged:

"The plaintiff did write a few letters to Mrs. * * * They were written at her request. They did not indicate sexual advances. The plaintiff told her that if she loved him the way to show it was to be good to her husband. He told her not to take her husband for granted. He told her not to ever tell her husband any stories. * * * The letters were not unusual for the plaintiff. He wrote similar letters to girls where he worked, usually written after the plaintiff and the girls

no longer worked at the same place. In 1949 seven of the plaintiff's girl friends wrote him a love letter on the same piece of paper. Defendant Nowotny is trying to create a false impression of a mental relapse when he states the letters were unusual for the plaintiff. * * *

"It appears from this unsigned paper in defendant Arno Nowotny's handwriting that he is trying to create the impression that the plaintiff was fighting over a woman when the plaintiff was fighting over a principle. The plaintiff was fighting for a cause, not a woman.

\* \* \* \* \* \*

"Thus it appears that the paper was completed by defendant Arno Nowotny with intent to frame."

Further allegations regarding Doctors White and Rousos follow:

"It appears that defendants Anthony P. Rousos and Paul White did base their decision that the plaintiff was mentally ill on false medical evidence. The plaintiff was living a very happy life at the time of his arrest. In so far as he can tell he was in as good a mental health as at any time in his life. If the plaintiff was sick at the time of his arrest, he is sick now. Furthermore he was born sick and has always been sick. He would not want to say this is not true. He cannot tell he was any different from what he has always been. If the plaintiff was crazy he was not dangerous for never in his life did he ever strike anyone even to defend himself when attacked. There was no need that he be confined for his safety and the safety of others."

During Thanksgiving week of 1955 appellant alleged that Dean Nowotny paid him an "unfriendly visit" and stated that he was "going to send the cops after him and have him put in jail."

Following the above alleged threat we find this allegation:

"On or about December 28 or 29, 1955 Mrs. * * * did tell plaintiff of some fun she had been having. She informed plaintiff she had been telling the dean (defendant Arno Nowotny) that the plaintiff had been annoying her, molesting her and making all sorts of improper advances towards her at a time when she had seen nothing of the plaintiff. What she said she had been telling defendant Nowotny was little short of attempted assault, yet she and the plaintiff were miles apart. Defendant Nowotny has neither confirmed or denied that he received any complaint from * * *."

Appellant also alleged that he ordered a transcript from the University registrar and was informed that it could not be issued until he had been cleared by the Dean of Student Life. Appellant then alleged:

"Defendant Nowotny called the registrar's office and told them the plaintiff was now entitled to a clear transcript. The plaintiff received his clear transcript thru the mail in a few days. But the plaintiff was double crossed. He only had a clear record long enough for him to receive a transcript. The plaintiff received a transcript dated July 13 1956 which bore the inscription, '1–18–56: Barred from readmission until cleared by Dean of Student Life'. The plaintiff was never notified of this action and first learned about it from the transcript. Since the plaintiff was not notified, he does not know their reason. The plaintiff received another transcript dated August 30, 1957 which bore the same inscription. There was no justification for this. The action is libelous. It reacts against employment."

Paragraph XIII of appellant's petition reads:

"The defendants Anthony P. Rousos and Arno Nowotny are charged with attempts to chase the plaintiff out of the City of Austin."

From paragraph XXIV we quote:

"The defendants are charged with attempts to interfere with the right of the plaintiff to sue. The plaintiff's sister, Majorie Morris, reports she was told that if the plaintiff were to sue, he would be imprisoned for life without trial, without due process of law and without any assigned cause of action. Defendant Anthony P. Rousos intimated on March 1, 1956 that if plaintiff were to sue, he would be imprisoned for a long time. The attempts of the defendants to interfere with the right of the plaintiff to sue and attempts of the defendants to chase the plaintiff out of the City of Austin are responsible for the delay in filing this suit."

Paragraph XXV reads:

"In addition to opposing the plaintiff making a living, defendant Arno Nowotny is opposed to the plaintiff receiving welfare assistance. The plaintiff's parents ages 80 and 70 are unable to support him but defendant Nowotny tells case wroker Miss Peterson on December 30, 1957 that responsibility rests with home. Responsibility rests with him when he frames. The plaintiff was out with no woman while he was in Austin and last had sex relations in 1938 but defendant Nowotny tells Miss Peterson that plaintiff was in trouble with girls. What women is he framing? The names of the girls would be interesting."

After pleading that he had been arrested and convicted in Baton Rouge, Louisiana, for loitering and arrested in San Marcos, Texas for being a suspicious person appellant alleged:

"Employers can understand these last two arrests and they will not

react against employment. Employers cannot understand the confinement of the plaintiff in Austin. The plaintiff has been unable to understand it either. Thus all facts should be made public. Suppressions of the truth and dissemination of false information by the defendants is keeping the plaintiff from obtaining employment. The defendants misrepresent character and disposition of the plaintiff."

█ The plea in abatement filed by appellees, other than Judge Johnson, is based on their immunity from suit without legislative consent since their acts about which appellant complains were committed by them in their representative capacities as employees of the University of Texas, an agency and instrumentality of the State.

Appellant filed an answer to this plea in abatement which is largely repetitious of the allegations of his original petition from which we have quoted extensively. We will, therefore, summarize or quote only the new matter which we find in appellant's answer, the first four paragraphs of which follow:

"I

"In order that the actions of the defendants which form a basis of this suit shall be within the scope of their authority as officers of the University of Texas, it is at least necessary that the defendants should show that they thought, felt or considered that the confinement of the plaintiff was legally justified and that they themselves believe the false dirogatory statements they have made concerning the plaintiff.

"II

"The plaintiff would show this honorable court that the defendants did not believe, feel or consider that the plaintiff was guilty of the offenses they charge, that they did not feel the con-

finement of the plaintiff was legally justified and they do not believe the false dirogatory charges they have made against the plaintiff but instead they are guilty of malicious prosecution. They had the plantiff confined for motives which they knew did not constitute a legal basis for confinement and they knew of no legal cause of action.

"III

"It is possible they initially made a mistake and were confused in the beginning. They stuck their neck out. They later saw their mistake prior to the confinement of the plantiff but were afraid to admit such. They perpetuated their false charges as face saving measures. They became malicious the minute they saw their mistake and refused to admit it.

"IV

"It is felt that the original petetion clearly lists actions of the defendants beyond the scope of their authority. But to make the fact that the defendants committed acts beyond the scope of their authority more obvious, the petetion has been amended. We procede to prove the new count in the petetion, 'malicious prosecution'."

We also quote paragraphs XII, XIII and XIV of the answer:

"XII

"Much misinformation has gone out from the University of Texas Health Department and from the Office of the Dean of Student Life concerning the nervious condition of the plantiff. The plantiff has been slightly nervious for many years. This was first noticed about 1938 and the plantiff was rejected for military service on March 31, 1942 for Psychioneurosis. The condition had improved much since that time and had improved at the

time the plantiff was committed to Austin State Hospital. There was no bahavior that could be attributed to nerviousness. It was gross, wanton and willful negligence if the defendants did not know about this. It was malicious prosecution if they did.

"XIII

"Defendants were certainly negligent when they failed to observe that because of a testicle injury, the sex urges of the plantiff are much weaker than the average male and consequently he would not be tempted to commit the acts they allege. It is doubtfull they would be so negligent. Therefore they were malicious.

"XIV

"Thus an excessive amount of negligence has been cited, gross negligence, willfull negligence and wanton negligence. It does not seem to be possible that they would be so negligent. Therefore they were malicious. Maybe the desire for malice just caused the negligence.

"Let us now discuss the motives for malice that existed. It is hard to say they committed their acts for a particular motive or set of motives. We just cite the motives that existed."

The motives referred to are described as follows:

"The plantiff had a lot of friends in Austin that he enjoyed seeing at times when seeking employment. He considered that being around the university would exert a pressure on the university to get him a job. But instead of exerting a pressure on them to get him a job, he seemed to have angered them very intensely and made them very determined that he should never have a job. Before the plantiff came back, they had everybody believing there was a very acute shortage of mathemati-

cians. The plantiff soon changed this talk to talk, jobs were scarce. A student would say, 'They tell me they are needing mathematicians.' The plantiff would say, 'This is propaganda to get students'. The student would say, 'I think you are right'. This panic about jobs which the plantiff was creating angered some fanatic worshipers of the university very much. There are those fanatics at most universities that worship the university as though it were a god. * * * The fanatics hurt the university they worship instead of helping it. The fanatics did not want to reward the plantiff by getting him a job. They decided the best way to stop this would be to but the plantiff in a hospital. When the plantiff would tell students about having out so many hundreds of application and no job, this would really create a panic despite the fact the applications had not had time to materalize. There grew bitter feelings toward the teachers who said there was a shortage of mathematicians. It was felt the plantiff was creating a public opinion that was a menace to the university. This public opinion was considered a menace in that it was causing the university to lose students. They overlooked the fact that this loss of students would make jobs more plentifull."

Paragraphs XXI, XXIII and XXIV of the answer read:

"The defendants were negligent when they failed to make it clear to the plantiff their reasons for confinement. When no reason is given, most people assume the reason is malicious and they had no legal justification. When anyone is confined, they have a right to know the reason."

"The authority of the defendants as officers of the University of Texas is limited to students currently enrolled. They act as individuals when they attempt to exercise authority over anyone

else. The plaintiff was not registered as a student after June 1955 and was first called to the dean's office in August 1955."

"The plaintiff has never heard any law quoted if one exists which gives the defendants authority to order anyone off university property. If there is such a law the plaintiff would like to know what it is. If there is such a law it would appear the proper charges to file against the plaintiff would be treaspassing."

It is our opinion that the plea in abatement was properly sustained on the ground that the pleadings of appellant, fairly construed, allege acts and conduct only on the part of these appellees which legitimately fall within the scope of their duties as employees of the University of Texas.

We are aware of Rule 45, T.R.C.P., which provides, in part, "That an allegation be evidentiary or be of legal conclusion shall not be ground for objection when fair notice to the opponent is given by the allegations as a whole." This rule also provides that "All pleadings shall be so construed as to do substantial justice."

 We do not believe that in a suit of this character where public officials are charged by general language with wrongful and malicious acts and conduct that such pleading should be liberally construed or that any intendments should be entertained in aid of the pleading. The valid, sound and legal presumption is that public officials perform their duties in a fair and efficient manner. When the contrary of this presumption is averred it should be specific and detailed and not by conclusions unsupported by facts. It is our opinion that a strict construction of appellant's pleading is necessary in order to achieve "substantial justice" required by the Rule.

There is no disputing that the University of Texas is an agency of the State. Walsh v. University of Texas, Tex.Civ.App., El Paso, 169 S.W.2d 993, writ ref. See also Allis-Chalmers Manufacturing Company v. Curtis Electrical Company, Tex.Civ.App., Austin, 259 S.W.2d 918, affirmed in part and in part reversed and rendered, 153 Tex. 118, 264 S.W.2d 700.

 Nor is it disputable that public officers are not liable to individuals for acts done within the scope of their public duties. And if an act is lawful motive of the actor is immaterial. Pridgen v. Giles, Tex.Civ. App., Austin, 267 S.W.2d 187, writ ref. N.R.E. See also 34 Tex.Jur. p. 466 and Campbell v. Jones, 153 Tex. 101, 264 S.W. 2d 425. In this latter case authority is quoted to the effect that school trustees are liable when and only when, in the exercise of powers conferred upon them, they have acted willfully or maliciously.

In our opinion there is no factual pleading here that appellees who are employees of the University have acted in a willful or malicious manner towards appellant.

The words "willful" and "malicious" may have slightly different meanings under different statutes or as an element of different causes of action but for our purposes here their meaning is amply given in Michels v. Boruta, Tex.Civ.App., Eastland, 122 S.W. 2d 216, 220, as follows:

"If the acts were maliciously done, they were willfully done. 'In general' says Corpus Juris, 'a malicious act involves all that is usually understood by the term 'willful' * * * Giving to the word 'malicious' its legal signification, a malicious act in a legal sense is defined as an unlawful act done *intentionally,* without just cause or excuse; a wrongful act *intentionally done* without cause or excuse; a wrongful act *intentionally done* without legal justification or excuse. In a legal sense, any unlawful act done *willfully and purposely* to the injury of another is as against that person malicious.' (Italics ours.) 38 C.J. 353, sec. 16."

Appellant's principal charges seem to be that he was ordered off the University Cam-

pus by Deans Nowotny and Bredt; that he was arrested by University policemen upon his refusal to leave University premises; that Doctors White and Rousos testified falsely regarding his mental condition; that he has been barred readmittance to the University; and that Dean Nowotny has given out false information to his employers or prospective employers.

The government of the University of Texas is vested in a Board of Regents with authority to "enact such by-laws, rules and regulations as may be necessary for the successful management and government of the University." Arts. 2584–2585, V.A.C.S.

■ We are not advised as to the nature of rules and regulations, if any, adopted under the authority of these statutes but without such knowledge it is our opinion that the above statutes imply the power and if they do not so imply then that the power is inherent in University officials to maintain proper order and decorum on the premises of the University and to exclude therefrom those who are detrimental to its well-being. We believe that appellant by his own pleadings and admissions has placed himself in this category.

The age of appellant is not shown but if he were an adult in 1938, as he states, then in 1955–6, when the incidents pertinent herein occurred, he must have been well above the age of the average University student. We believe that it was well within the discretion of the University officials to bar from its campus and from association with its youthful students a man of appellant's age, beliefs, proclivities, and so-called principles when, as appellant's pleadings show, such beliefs were advocated in a manner calculated to be offensive and to interfere with the orderly, peaceful and dignified atmosphere of University Life.

Since the acts and conduct of Doctors White and Rousos and Deans Nowotny and Bredt of which appellant complains were all directly or incidentally performed in carrying out the duty of the University to police its grounds and protect its students from improper influences and hence were lawful acts we are of the opinion that they are not suable in the absence of legislative consent.

We have not overlooked the allegations of malice. Most of these allegations are general. The closest approach to being specific in this regard is the allegation that Doctors White and Rousos based their opinions that he was mentally ill "on false medical evidence." The only medical evidence which the record discloses is that given by the doctors themselves. If appellant is charging that these doctors testified falsely then it is our opinion that this statement is refuted by appellant's own words that he was "born sick and has always been sick. He would not want to say this is not true."

With regard to the charge that Dean Nowotny has furnished false information to employers and prospective employers of appellant it is alleged that some of this "misinformation" related to his nervous condition. Appellant then pleads that he has been "slightly nervous" for many years. Exactly what representations were made by any University official regarding the nervous condition of appellant is not alleged.

Appellant also alleged that Dean Nowotny falsely stated that appellant had written letters to a woman indicating "childish sexual advances." These letters are not in the record.

Under our view that appellant's pleadings should be strictly construed it is our opinion that appellant should have alleged what Dean Nowotny said about his nervous condition as well as alleging the contents of the letters which appellant had written. We are not disposed to accept appellant's conclusions that false statements were made as to these matters absent a proper basis in the pleadings from which such conclusions could be fairly drawn.

We have construed appellant's pleadings so as to achieve substantial justice in this

case. Our construction of them is that they do not adequately allege that any University official intentionally committed an unlawful act injurious to appellant.

The judgment as to Judge Johnson is affirmed. The judgment as to the other appellees is reformed so as to dismiss appellant's suit without prejudice and as reformed such judgment is affirmed.

Reformed and affirmed.