**John David BUTTNY et al., Plaintiffs,**

v.

**Joseph R. SMILEY, President of the University of Colorado, and the Regents of the University of Colorado, Defendants.**

**Civ. A. C–666.**

United States District Court
D. Colorado.

Feb. 14, 1968.

Walter C. Brauer, III, Denver, Colo., for plaintiffs.

John P. Holloway, Boulder, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

Plaintiffs are students or former students at the University of Colorado who have been subjected to disciplinary action by the University. Their complaint and motion for a preliminary injunction allege violations of rights guaranteed to them by the First and Fourteenth Amendments to the United States Constitution. They have exhausted their available administrative remedies; this Court has jurisdiction under the Civil Rights Act, 42 U.S.C. § 1983; 28 U.S.C. § 1343. At the January 26, 1968 hearing in this Court, the parties stipulated that the hearing would be considered as a trial on the merits. The evidence before the Court is for the most part transcripts of prior administrative hearings and documents which were admitted on stipulation of counsel; additionally, some live testimony was offered and received.

This case arises out of disciplinary action taken by the University against plaintiffs after an October 25, 1967 protest demonstration at the University Placement Service on campus. Individually and collectively (as a group) the plaintiffs have admitted taking part in the protest activity which involved physically blocking and prohibiting entrance to the Placement Service by standing in the doorways to the offices. As a result of this activity students with scheduled interviews, students who desired to schedule interviews, personnel of the Placement Service, University officials and persons recruiting for various concerns were denied access to the offices of this department of the University. The plaintiffs were specifically protesting the recruiter from the Central Intelligence Agency of the United States.

Because of these activities plaintiffs were individually charged with the following:

1. Depriving students of the right of access to the Placement Bureau by

physically blocking and prohibiting entrance to the Placement office.

2. Depriving University officials the right of access to the Placement Bureau by physically blocking and prohibiting entrance to Placement offices.

3. Prohibiting Placement office personnel from properly maintaining the University's Placement Service.

4. Depriving recruiters, who were scheduled under current University policies, their right to properly interview students for job placement.

5. Refusing to cease and desist from physically blocking entrance to said offices when requested to do so by University officials.

A full and open hearing was held before the University Discipline Committee. The hearing was conducted in conformity with the procedures set out in a document entitled "University of Colorado Discipline Procedures and Structure" approved by the Board of Regents of the University April 28, 1960. The decision of the University Discipline Committee (U.D.C.) was appealed to the Appellate Subcommittee of the Administrative Council and the decision of that body was further appealed to the Board of Regents. As a result of the hearing and appeals, nine of the plaintiffs have been suspended from the University with the right to apply for re-admission after the 1968 spring semester, nine were suspended and immediately readmitted under probationary status for the remainder of their enrollment, and four were placed on indefinite probation. At each level, the decisions were unanimous.

In their complaint and motion plaintiffs assert that the defendants violated their constitutional right to due process of law in the following particulars:

1. The defendants accepted jurisdiction of the matter based on rules that did not exist.

2. The rules which the plaintiffs allegedly violated are vague and uncertain in that they (a) fail to provide sufficient notice to the plaintiffs of the proscribed conduct, and (b) they fail to provide sufficient standards to guide the University disciplinary bodies in determining if a violation has occurred.

3. The rules are over-broad and sweeping so that they prohibit conduct protected by the First Amendment to the United States Constitution by their chilling effect upon the exercise of the guaranteed right of free speech.

4. The defendants agreed to hear the case of the plaintiffs together, then to act on each case individually in determining culpability and punishment, but they violated their own rule by acting on the plaintiffs as a group.

Plaintiffs further allege that their constitutional right to equal protection of the law was encroached upon by defendants in the following manner: (1) The U.D.C. imposed upon the plaintiffs differential punishment, discriminatory because there was no evidence to substantiate any differential treatment, and (2) the punishment is arbitrary and unrelated to the evidence.

Additionally, plaintiff Brian McQuerrey complains that he was further denied due process and equal protection within the meaning of the Fourteenth Amendment because the punishment imposed upon him (suspension) was founded on evidence of prior disciplinary action which prior action was constitutionally infirm. In the fall of 1962 McQuerrey, then a freshman, pleaded guilty to a charge of "interference" in a Boulder court. At that time he was not advised of his federal constitutional rights to remain silent and to have the advice of counsel. As a result of this conviction he was called before an Assistant Dean of Men and was given a "University warning" which is a form of punishment; if there is an accumulation of these warnings more severe action is taken, possibly probation or suspension. In effect, McQuerrey is making a collateral attack on the original conviction; if

the conviction is void, so also is the disciplinary action taken by the University. In October 1963 McQuerrey appeared before the University Discipline Committee on a charge of gambling in the residence halls. At that hearing he was not advised of his rights to counsel and to appeal. He was then placed on probation. The two prior proceedings against Mr. McQuerrey were considered by the U.D.C. in setting his punishment in the present action.

We are asked to permanently enjoin defendants from interfering with the pursuit by plaintiffs of their studies and to re-admit the suspended plaintiffs. They also ask that defendants be ordered to strike from their files any reference to the disciplinary action and its results.

■ Plaintiffs' claim that defendants based jurisdiction on rules that did not exist belies the record. They were advised, in writing, that the University was relying on the following rules:

Students have equivalent responsibility with the faculty for study and learning. They should be judged on the merits of their performance without reference to their political, social, or religious views. The University of Colorado expects its students to obey national, state and local laws; to respect the rights and privileges of other people; and to conduct themselves in such manner that reflects credit upon the University. (From University of Colorado Discipline Procedures and Structure, approved by the Board of Regents April 28, 1960.)

HAZING. Hazing in all forms is prohibited in this University. Students who thus interfere with the personal liberty of a fellow student are rendered liable to immediate discipline. This rule is extended to cover class conflicts, injury to property on the campus or elsewhere and interference in any manner with the public or private rights of citizens. (From Article XIV, Section 2, of the Laws of the Regents, compiled January 1, 1964.)

Both of these rules were promulgated by the Board of Regents, a body created by the State Constitution to govern the University.

Article IX, Section 14, of the Colorado Constitution provides: "The board of regents shall have the general supervision of the university * * *." In Sigma Chi Fraternity v. Regents of University of Colorado, 258 F.Supp. 515 (D.Colo. 1966), the court said, " * * * the University and the Regents as its governing board, can validly impose a wide variety of regulations." Goldberg v. Regents of University of California, Cal.App., 57 Cal.Rptr. 463, holds in substance that reasonable regulation to prevent interference with the conduct of the University's administrative responsibilities is clearly within the rule-making jurisdiction of the University.

■■ These rules are not so vague or uncertain as to require us to declare them invalid. Although they are not in a form of specific prohibitions, such as "Thou shalt not physically prevent other students from using University facilities," nevertheless they do set standards for acceptable conduct which are readily determinable and should be easily understood. As noted by the Administrative Council in its decision, 'The University is not required to provide a negative type of behavioral code typical of criminal laws'; we fully agree with that finding.

In Goldberg v. Regents of the University of California, 57 Cal.Rptr. 463, 472 (Cal.Ct.App.1967), the court says:

Broadly stated, the function of the University is to impart learning and to advance the boundaries of knowledge. This carries with it the administrative responsibility to control and regulate that conduct and behavior of the students which tends to impede, obstruct or threaten the achievements of its educational goals. Thus, the University has the power to formulate and enforce rules of student conduct

that are appropriate and necessary to the maintenance of order and propriety, considering the accepted norms of social behavior in the community where such rules are reasonably necessary to further the University's educational goals.

The United States Supreme Court has frequently enunciated the test for determining whether a statute is unconstitutionally vague.

> * * * a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. Cramp v. Board of Public Instruction, etc., 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

Assuming that the rules under which the plaintiffs were charged are required to meet this test, we do not believe that the "Hazing" rule, Laws of the Regents, which was the rule upon which the Administrative Council based their decision, is so vague that students of common intelligence must necessarily guess at its meaning. The record clearly reflects that each of the plaintiffs knew he was violating recognized standards of conduct and each expected to be punished in some manner. In some instances the plaintiffs admitted their awareness of the rules.

▬ We are not convinced that because there may be borderline cases the University officials must be denied the goals and protections they seek. Where there is doubt as to the nature of a student's activity we cannot assume that the disciplinary bodies will not accord them full protection. Regulations and rules which are necessary in maintaining order and discipline are always considered reasonable. See Dickey v. Alabama State Board of Education, 273

F.Supp. 613 (M.D.Ala.1967). We are persuaded that the "Hazing" rule is not on its face a prior restraint on the right to freedom of speech and the right to assemble. The language is clear; it authorizes discipline for "any interference with the public or private rights of citizens." Since the "Hazing" rule is not constitutionally vague, it is not necessary for us to make a specific finding regarding the other rules involved. Certainly their language is broad; however, we are unable to find any cases, nor were any called to our attention, which have held university regulations such as these to be invalid because they are so vague as to deny due process of law. In fact the recent cases have not denied the validity and reasonableness of some very broad disciplinary regulations. In addition, it cannot be denied that university authorities have an inherent general power to maintain order on campus and to exclude those who are detrimental to its well being. Goldberg v. Regents, supra; Morris v. Nowotny, Tex.Civ.App., 323 S.W.2d 301 (1959). The rule which the University of California students were charged with having violated and which action resulted in the "four-letter word" case of Goldberg stated:

> It is taken for granted that each student * * * will adhere to acceptable standards of personal conduct; and that all students * * * will set and observe among themselves proper standards of conduct and good taste.

In the leading case of Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), the regulation which went unquestioned by the court stated:

> Pupils may be expelled from any of the Colleges:
>
> *    *    *    *    *    *
>
> C. For Conduct Prejudicial to the School and for Conduct Unbecoming a Student or Future Teacher in Schools of Alabama, for Insubordination and Insurrection, or for Inciting Other Pupils to Like Conduct.

In Due v. Florida A. & M. University, 233 F.Supp. 396 (N.D.Fla.1963), the district court upheld the suspension of students under a rule which stated:

> Disciplinary action will be taken against students for:
>
> \*    \*    \*    \*    \*    \*
>
> 6. Misconduct while on or off the campus. This includes students who may be convicted by University officials, or city, county, or Federal police for violation of any of the criminal and/or civil laws.

The right of the University administration to invoke its disciplinary powers in this instance need not be entirely bottomed on any published rule or regulation. As previously noted, it is an inherent power that the school administration authorities have to maintain order on its campus, and to afford students, school officials, employees and invited guests freedom of movement on the campus and the right of ingress and egress to the school's physical facilities. We agree with the students that the doctrine of 'In Loco Parentis' is no longer tenable in a university community; and we believe that there is a trend to reject the authority of university officials to regulate "off-campus" activity of students. However, that is not to say that conduct disruptive of good order on the campus should not properly lead to disciplinary action.

We do not subscribe to the notion that a citizen surrenders his civil rights upon enrollment as a student in a university. McLaurin v. Oklahoma State Regents for Higher Ed., 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950); Dixon v. Alabama, supra. As a corollary to this, enrollment does not give him a right to immunity nor special consideration, and certainly it does not give him the right to violate the constitutional rights of others.

Here plaintiffs freely admitted and openly boasted that their accused activity was "civil disobedience". They expected and wanted to be arrested by the civil authorities, and they wanted to be tried in civil court as a means of pointing up their intense opposition to the C.I.A. And all of this took place "on campus".

Their conduct in this Court's opinion was much more than is fairly understood to be embraced within the term "political activity". Plaintiffs engaged in overt physical acts which effectively interfered with one of the normal activities of the University, namely interviewing students for employment.

Plaintiffs contended that the action of the University officials had a "chilling" effect on the First Amendment right of freedom of speech. What they said on the occasion in question is not the basis for the disciplinary proceedings; it is what they did. We hold that the First Amendment guarantee of freedom of speech, as it is related to plaintiffs' activities here, does not give them the right to prevent lawful access to campus facilities. We have been unable to find any case that holds that active, aggressive physical action may properly be characterized by the courts as free speech.

In Baines v. City of Danville, 337 F.2d 579 (4th Cir. 1964), a case dealing with racial demonstrations, the court at p. 586 says:

> Whatever constitutional basis there may be for the substantive demands of the demonstrators, they have, unquestionably, rights of free speech and assembly guaranteed by the First Amendment, and recognition of those First Amendment rights is required of Danville by the Fourteenth Amendment. Those First Amendment rights incorporated into the Fourteenth Amendment, however, are not a license to trample upon the rights of others. They must be exercised responsibly and without depriving others of their rights, the enjoyment of which is equally precious. It is thus plain, for instance, that while Negroes, excluded because of their race from a privately

operated theater, have a right to protest their exclusion and to inform the public and public officials of their grievance, they do not have the right, by massive occupancy of approaches to the theater, to exclude everyone else from it, * * *.

Similarly plaintiffs in the present case had a right to be where they were at the time in question, but they did not have the right to exclude others from free movement in the area.

■ Plaintiffs cannot complain that they were tried as a group. The evidence clearly shows that they were acting as a group with a common purpose; they were partners in the transaction and they acted in concert, one segment of the group deployed at one door and the other segment deployed at another door. They locked hands or arms to prevent others from gaining access to the rooms. One of the documents filed with the University Discipline Committee and signed by all plaintiffs contained this statement: "We acted as a group and we request to be tried as a group." Additionally, they called themselves "The Ad Hoc Committee Against the C.I.A." and signed some documents as members of such Committee.

■ Plaintiffs' claim that they were denied equal protection of the laws is not supported by the record. There were three distinct types of punishment imposed: (1) Suspension with permission to re-apply after the end of the 1968 spring semester; (2) Suspension with immediate re-instatement and probation; and (3) Probation. With the exception of plaintiff Brian McQuerrey, the punishment meted out to the respective plaintiffs was in direct relation to the student's class year at the University and his maturity. The group receiving the most severe punishment were graduate students, some of whom were receiving financial aid as research or teaching assistants. Those receiving the least punishment were the first semester students. We think it just and proper that the graduate students should be held more strictly accountable and responsible for their individual acts. Certainly we do not believe that the classification of the plaintiffs in this manner is unreasonable. See People v. Stark, 157 Colo. 59, 400 P.2d 923; Landwehr v. Regents of University of Colorado, 156 Colo. 1, 396 P.2d 451.

■ Mr. McQuerrey was in a different situation. He was not a graduate student and the basis for his being given the same punishment as those students was his involvement in two prior disciplinary actions. The first one resulted after he had been arrested by the Boulder city police, pleaded guilty, and was assessed a fine. At that time he was not advised of his constitutional right to remain silent and his right to counsel. He then asserts that the disciplinary action at the University based on his guilty plea cannot be used against him. He attempts to make a collateral attack on the original plea of guilty; certainly in the present proceeding we cannot determine that the conviction in the city court was constitutionally infirm. See Gayes v. State of New York, 332 U.S. 145, 67 S.Ct. 1711, 91 L.Ed. 1962 (1947).

■ The second offense that was used as a basis for the disciplinary action against McQuerrey was a previous admission by him that he had been involved in gambling in a dormitory on campus. He now complains that he had not been informed of his federal constitutional rights, and although he was placed on probation by the University authorities he claims that he left school and did not know that such punishment had been imposed. The record before us does not support his position; it shows conclusively that he did know that he had been placed on probation and he made no effort to appeal from that status. We know of no legal authority that requires university officials to advise a student involved in disciplinary proceedings of his right to remain silent and to be provided with counsel.

It should be noted that the punishment originally imposed on plaintiff Roth by the University Discipline Committee was reduced on appeal by the Subcommittee of the Administrative Council. They found that his punishment was based partially on a prior disciplinary action, but there was no authority for the original disciplinary action and, therefore, it could not properly be used as a basis for punishment in this case. That modification of the sentence imposed further demonstrates a careful consideration as to each involved student.

■ Once the facts have been found by the disciplinary body and the guilt has been established, punishment is then a matter of judgment and discretion within the recognized limits. Our only inquiry here relating to the punishment imposed is: "Is the punishment meted out within accepted limits, and, if it is, did the authorities act arbitrarily or capriciously?"

■ We are to consider the constitutional validity of the action taken by the University authorities. We have heretofore discussed the legality of the rules and regulations involved, and we have found them to be constitutionally sound and acceptable. We have found that the equal protection clause of the Fourteenth Amendment was not violated, and now we deal with the important question of whether or not the plaintiffs were afforded procedural due process by the University authorities. Our unequivocal answer is, they were.

■ The test of whether or not one has been afforded procedural due process is one of fundamental fairness in the light of the total circumstances. See Sigma Chi Fraternity v. Regents, supra. That case held, consistent with other legal authority, that no particular method of procedure is required for due process, but what is required is: (1) Adequate notice of the charges; (2) Reasonable opportunity to prepare for and meet them; (3) An orderly hearing

adopted to the nature of the case; and (4) A fair and impartial decision.

It is uncontroverted here that prior to the University Discipline Committee's hearing each plaintiff was served with a written charge sheet which specifically set out the conduct upon which the disciplinary action was based. On motion, plaintiffs were furnished citations of the specific rules and regulations they were accused of violating. They were furnished the names of the witnesses who would appear against them.

At the plaintiffs' request, they were granted a public hearing. Uniformly, it is the practice of this Discipline Committee to have a closed hearing, and this is for the protection of the student. But, they asked here for an open hearing and they were given it. They were represented by counsel, two senior law students and one law graduate. They were also afforded an opportunity to cross-examine the witnesses who appeared against them, except one, whose affidavit was admitted into the record.

Each plaintiff was given the right to testify in his own behalf, not only to testify factually but to give his reasons for his action and even to expound his political philosophy, including his criticisms of American foreign policy and the C.I.A. Each respective student was allowed to testify as he desired whether or not the testimony had any relevance to the facts. Even persons who had no knowledge of the facts were allowed to testify on behalf of the plaintiffs. A Dr. Richard Moskowitz, not a member of the University community as such, testified and read into the record part of a paper excoriating the C.I.A. and attempting to justify the students' action here. The document itself appears in the record as an exhibit. None of these things would ordinarily be done in any court of law. The University administration went far beyond what was required of them in receiving evidence submitted by the students.

At the end of the U.D.C. hearing, a complete typewritten transcript of the

proceedings was furnished to the students for use on appeal. The plaintiffs were given an appeal to the Subcommittee of the Administrative Council and finally an appeal to the Board of Regents. No additional evidence was taken before the appellate bodies, but the students were represented by counsel in each instance and counsel were permitted to argue on their behalf.

Although the University administration was represented by its resident counsel at all proceedings, he did not act in an adversary capacity. He functioned largely as an advisor on procedural matters to the Discipline Committee. He made no closing argument to the U.D.C. and no argument whatsoever to the Administrative Council or to the Regents in connection with the appellate proceedings.

We feel that the University Discipline Committee with Miss Parish as presiding official acted fairly and justly in this case. They were patient. They were deliberate. Their decision was unanimous. The Subcommittee of the Administrative Council, appointed by the President of the University, was composed of the Deans of the Schools of Business, Pharmacy and Journalism, top officials in the University. Their decision was unanimous. The Board of Regents in affirming the Administrative Council by Resolution was also unanimous. There is no indication that these people, who served in the somewhat unpleasant task of disciplining the students, acted in concert. They exercised, we think, their individual best judgment; they acted not only for what they felt was just and proper under the law, not only for what was best for the University, but also for what was best for the students involved.

We accept and agree with the statement made by Jacobson in his treatise entitled "The Expulsion of Students and Due Process of Law, Right to Judicial Review" which appears in 34 Journal of Higher Education, 250, 253 (1963). He stated, "Judicial review in this type of case is limited to the scope of the regulation or regulations, their reasonableness and the bona fides, not the wisdom of the discretion exercised under it."

In the record before us, there are communications from several University faculty members; the communications suggest that the punishment imposed on plaintiffs is unduly harsh. This may very well be so. It is a matter of opinion and judgment. We find that the punishment meted out to the respective plaintiffs was neither arbitrary nor capricious. It was within recognized and accepted limits. It was not in bad faith and was not an abuse of discretion. Plaintiffs' constitutional rights were not invaded, violated or denied. Even if we were disposed to do so, we are without authority to modify the punishment in any way. We cannot determine the wisdom of what has been done in this case by the University administration.

For the foregoing reasons, it is

Ordered that the motion for preliminary and permanent injunction be and hereby is denied. It is further

Ordered that the complaint and cause of action be and hereby is dismissed.