## Lee v. School District of Philadelphia

*John Roberts*, for plaintiffs.
*David Bruton*, for defendant.

KELLEY, J., January 7, 1971.—This is a complaint in equity by minor plaintiffs, Oscar Lee, Melvin Sparks, West Cook and Carl Davis, who have brought this suit by their respective guardians and parents. They seek an injunction against the Philadelphia School District restraining defendant from preventing them from attending the Benjamin Franklin High School. Their primary prayer is their restoration to the student body of Benjamin Franklin High School from which they had been transferred on No-

vember 3, 1970. By stipulation of counsel at the trial, Mr. Bass, principal, was dropped as a party defendant and the case continued only as to the Philadelphia School District.

About the middle of October 1970, plaintiff, Oscar Lee, entertained ambitions to become a candidate for the office of vice president of the Benjamin Franklin High School Student Association. After routine notices had been circulated from the principal's office inviting those students desiring to be candidates for the student association to meet vice principal Edwards on October 12, 1970, at a room designated, plaintiff, Lee, did not attend, claiming that he was unaware of such meeting. However, he did attend the second meeting on October 15th with the other declared candidates. On October 26th, Mr. Edwards again called a meeting, at which time he brought to the attention of the group the fact that the attendance record of Oscar Lee was so poor that, under the rules, it made him ineligible for office. Qualifications for office which were in effect at the time required (1) reasonably good grades; (2) a reasonably good attendance record; and (3) that the candidate have no job outside of school hours which would prevent him from giving full attention to the office. These rules had been in effect at least since the prior school year of 1969-70 when an election of officers of the first class was held and during which time the prior practice of having candidates file signed petitions for office was eliminated because it was impracticable to follow it through. Between October 15th and October 26th, the vice principal, Mr. Edwards, the regularly appointed sponsor for the student association, checked records and ascertained that Oscar Lee had already absented himself without authority from school for 10 days in the current school year, during the period from September 10th, when school

sessions were belatedly started, due to a strike of teachers. Moreover, Lee's school attendance record for the school year 1969-70 showed that he had neglected to attend classes, without excuse, for 38 days during that year. Mr. Edwards, on October 15, 1970, was already aware that Lee had a poor attendance record and had explained to him at that time he would be ineligible to be a candidate. Lee, however, came to the meeting on October 26th and again was informed by Mr. Edwards regarding his ineligibility. Having done this, Mr. Edwards requested Lee to step out of the room for a few minutes. During that interval, those assembled at the meeting signified that they were in accord with the rule that one with a poor attendance record should not be a candidate. Thereafter, a vote by ballot was taken and the group unanimously concurred with Mr. Edwards that Lee could not be a candidate. There was no denial of these absences without excuse by Mr. Lee. He explained that during the school year 1969-70 he had lived in several widely separated places in Philadelphia and, because of the work in which he had been involved, he had been absent from school frequently.

Oscar Lee became irritated and unhappy over the action disqualifying him. Although he went back to class following the meeting of October 26th, he did not remain in school after the luncheon hour. For some reason, he was unable to contact his own counselor in the morning but he did secure permission from another counselor allowing him to absent himself in the afternoon to attend a meeting at 1 p.m. in the city at a Federal agency. That evening, accompanied by some other pupils, Lee went to a church at Broad and Diamond Streets where he prepared a one-page leaflet denouncing the principal and vice principal as "bootlickers" and making other statements

therein which were highly inflammatory. Outside of the printed matter in the leaflet, there appears a sketch of a man on the left side of the page under which the name "Oscar Lee" is inscribed. On the right side of the page another person holds a gun which appears to be a submachine gun. The legend at the top of the page in large letters is "BLACK BROTHER NIXED FROM ELECTION BY PIG PLOT." In the typewritten matter, the first paragraph is an extract from one of the paragraphs in a memorandum published by the Superintendent of Schools on September 30, 1968. The rest of the leaflet is as follows:

"On October 26, 1970, the Black Vice Principal of Benjamin Franklin High School directly interfered with the established election processes as an attempt to block black student activity at the school. The Vice Principal I speak of is named Mr. Edwards, and he is known for being a bootlicker and a yes-man.

"The black brother in the picture is Oscar Lee, a candidate for Vice President of the Student Association, who has been shrewdly nixed by a mockery of a vote by other candidates at the direction of Mr. Shine himself, Mr. Edwards. Think about this, if you had 4 dudes running for an office and 1 was undesirable to the other 3 because they thought he could win, it would be common trickery politics to oust him, which would better the other 3's chances of winning. For another unfair twist, there is no sponsor for the SA but Bass has allowed Edwards to be the 'acting sponsor.'

"The motto of the BLACK TICKET (Oscar Lee & West mumia Cook) is "BLACK REVOLUTIONARY STUDENT POWER TO THE BLACK BROTHERS OF MALCOLM X!! We mean to fight for it, AND GET IT! *BY ANY MEANS NECESSARY!*

"NATIONAL BLACK STUDENT LIBERATION NEWS SERVICE."

Early the next morning, West Cook, one of the plaintiffs, presented himself on the street outside the doors of Benjamin Franklin High School at or about 8 a.m. and distributed copies of the said leaflet. This leaflet quickly was brought to the attention of the principal and vice principal. Some minutes following the opening of school, plaintiff, Lee, arriving late, appeared in the corridor carrying with him a substantial number of the leaflets. Mr. Edwards accosted Lee and had him accompany him to the principal's office where Mr. Bass ordered the papers to be confiscated.

While this was going on, the junior class had assembled in the auditorium a short distance from the administration office. There, each of the candidates had taken his place on the stage with the intention of making known his qualifications to the assembled class. Unfortunately, however, when an attempt was made to use the microphone, it was discovered to be out of order. Having sent for the man in charge, Mr. Edwards, at the suggestion of the principal, directed the junior class to move on to their regular classrooms. At this point, plaintiff, West Cook, arose from his seat in the audience and began reading aloud the contents of the leaflet in question. Mr. Edwards ordered him to discontinue but Cook refused, continuing to read until he had completed the whole article. A group of students, including the four plaintiffs, then began mixing among the other students requesting them to go to the principal's office and have the leaflets returned. One of the plaintiffs, Melvin Sparks, without authority, removed a chair from the principal's office to the corridor where he stood on the same in addressing the

group there assembled. When ordered to return the chair by Mr. Edwards, Sparks refused to do so.

The four plaintiffs then started persuading other students to skip class and join with them in a meeting on the sixth floor in the cafeteria. On the way to and from this location, demonstrations occurred. There was banging on the doors of classrooms and disorder in the hallways. In one case, at least, plaintiff, Sparks, entered a classroom requesting the teacher to allow the students to attend the meeting on the sixth floor. When 100 to 150 students had assembled in the sixth floor cafeteria, each of the minor plaintiffs in turn addressed the gathering, urging that a visit be made immediately to the principal's office to demand the release of the leaflets. A group of 10 was selected to do this and they, thereafter, appeared in the corridor outside the principal's office. However, at that point, it was determined among them that only Cook, Lee and Sparks should enter the principal's office. Those in the corridor as well as those who entered the principal's office still remained away from class. There was turmoil in the whole school due to groups moving around, shouting and damaging physical property. It was necessary for the principal to secure additional security personnel from the Civil Disobedience Squad as well as from the school district's administration office. One group of pupils, in moving through the basement corridors, twice threw a wall fire extinguisher through a glass door leading to a classroom, smashing the door. The security group was required to continue patrolling the corridors.

On October 27th, nine students, including plaintiffs, were suspended by the principal, Leon Bass, for participating in disruptive demonstrations and refusing to follow instructions. Formal notices were sent out to the parents and guardians informing them of the

suspensions and, in some instances, telephone calls also were made.

Plaintiffs were fully aware of a memorandum issued September 30, 1968, by the school district entitled, "Policy Respecting the Right of Students to Circulate Petitions and Handbills, To Use Bulletin Boards and to Wear Insignia." Indeed, the first paragraph of the leaflet or circular was copied verbatim from the said memorandum. However, the leaflet significantly omits paragraph 2(e) which states, "The school shall prohibit the distribution of material within the restricted categories of paragraph 1(a) above." More significantly, it omitted paragraph 1(a) which reads:

"School authorities shall prohibit material which is obscene according to current legal definitions; which is libelous; or which inflames or incites students so as to create a clear and present danger of the commission of unlawful acts on or of physical disruption to the orderly operation of the school."

The transfer of the students to high schools other than Benjamin Franklin High School was for disruptive activities, flagrant insubordination, defiance of authority and incitement to disorder.

The high schools to which plaintiffs have been assigned are not so far away from their homes as to inconvenience them to any significant degree in moving back and forth. While there are slight differences between the curriculum at Benjamin Franklin High School and the several others involved, this is not of substantial moment and would have little, if any, injurious effect on the course of study as originally arranged.

Officials of defendant school district have the responsibility of maintaining a scholarly, disciplined atmosphere within Benjamin Franklin High School. These officials not only have a right, they have an

obligation to prevent anything which might be disruptive of such an atmosphere. School officials must be given a wide discretion and if, under the circumstances, a disturbance is reasonably to be anticipated, actions which are necessarily calculated to prevent such a disruption must be upheld by the court. Mindful of such duties, defendant, Philadelphia School District, issued a regulation for use in the schools entitled "Policy Respecting the Rights of Students to Circulate Petitions and Handbills, to Use Bulletin Boards and to Wear Insignia." It provides, inter alia, that students shall be free to distribute handbills, leaflets and other printed material and to collect signatures on petitions concerning school or out-of-school issues, whether such materials are produced within or without the school. It further provides in section 1(a) thereof that "School authorities shall prohibit material which is libelous; or which inflames or incites students so as to create a clear and present danger of the commission of unlawful acts or physical disruption to the orderly operation of the school." This is a sound and reasonable regulation. Freedom of speech, which includes publication and distribution of leaflets, or handbills, may be exercised to its fullest potential on school premises so long as it does not unreasonably interfere with the normal school activities. School officials cannot infringe on their students' rights to free and unrestricted expression guaranteed to them under the first amendment to the Constitution where the exercise of such rights in the school buildings and school rooms does not materially and substantially interfere with the requirment of appropriate discipline in the operation of the school: Burnside v. Byars, 363 F. 2d 744 (1966). In this case, however, the leaflet distributed or intended to be circulated was inflammatory, libelous and defamatory and it materially and substantially interfered with the requirements of

appropriate discipline in the operation of Benjamin Franklin High School. The substantial disorder or the invasion of the rights of others is, of course, not immunized by the constitutional guarantee of free speech. The Constitution does not confer unrestricted and unbridled license giving immunity for every possible use of language and preventing the punishment of those who abuse their freedom: Whitney v. California, 274 U. S. 357, 47 S. Ct. 641. In the case now before the court, the Philadelphia School District did not deprive plaintiffs of their constitutional right to freedom of speech.

Plaintiffs also claim they were denied a proper hearing for the purpose of deciding whether or not they should be transferred to other schools and that this was a denial of due process of law in violation of the Fourteenth Amendment to the United States Constitution.

Schools are dedicated to accomplish the education of our young who spend several hours each day in school which, during the early part of their lives is virtually a home away from home. As parents are charged with the discipline of children in the home, so, too, are teachers and school officials charged with the responsibility for the conduct, training and education of our young people while in school. Just as parents may be chastised for the conduct of their children under certain circumstances, for example, violation of the truancy laws, so, too, may school officials be criticized and brought to task for failing to circumscribe the conduct of children while they are in school. In order to accomplish this purpose, certain rules and regulations must be prescribed as a guide within the reaches of which such a child's conduct must remain. While the principal use to which the schools are dedicated is to accommodate students during prescribed hours for certain types of activities, discipline

514

and social behavior are not only an inevitable part of the process of schooling, they are also an important part of the educational process: Whitfield v. Simpson, 312 F. Supp. 889 (1970). It is a basic principle that the school authorities are possessed with the power and the duty to establish and enforce regulations to deal with activities which may materially and substantially interfere with the requirement of appropriate discipline in the schools: Griffin v. Tatum, 300 F. Supp. 60 (1969).

The test of whether or not one has been afforded procedural due process is one of fundamental fairness in the light of the total circumstances. No particular method of procedure is required for due process, but what is required is: (1) adequate notice of the charges; (2) reasonable opportunity to prepare for and meet them; (3) an orderly hearing adapted to the nature of the case; and (4) a fair and impartial decision: Buttny v. Smiley, 281 F. Supp. 280 (1968). The school district promptly and fairly carried out all of these requirements. Written notice by mail was forwarded by Leon Bass, the principal of the high school, to the parent or guardian of each plaintiff under date of October 27, 1970, carrying the information (1) that their son or ward had been suspended from school until further notice; (2) that the charge against the student was that he participated in a disruptive demonstration and refused to follow the directions of the school administration in this regard; (3) that they were requested to come to the school on Monday, November 2, 1970, five days later, when he, Mr. Bass, would "cover the steps he must take in this important matter." Plaintiffs were further advised in the letter, that if they encountered any difficulties in keeping the appointment they were to call the school at LO 7-7045. Finally, they were told, "Your son is not to come to school during the period of suspension."

Thus, a copy of the charges was timely given, a definite date and hour was set for hearing and sufficient time and reasonable opportunity was afforded to get ready for the meeting called for November 2nd. With the exception of Mrs. Cook, mother of minor plaintiff, West Cook, who was unable, because of her work, to attend the meeting, all other parties, including counsel for the plaintiffs, were present at that hearing. The latter was there with the acquiescence of the principal, Mr. Bass. Each of the parties was allowed to discuss the accusations fully and adequately and, at the end of this interchange, the principal of the high school informed those assembled that he was recommending to the district superintendent of schools that the four minor plaintiffs be transferred to other high schools. Immediate remonstrances and objections to such transfers having been made, the principal of the high school emphasized and made clear that he had no right or power, as principal, to make transfers; that this authority and responsibility rested with the district superintendent, Mr. Frangipanni, to whom he was forwarding his recommendation and that they should register their objections with the latter. He made it clear to them, however, that he did not intend to change his recommendation and that whether or not transfers took place, was strictly the district superintendent's responsibility. He plainly explained that they were accorded the right to confer with the district superintendent and state their objections and complaints and he furnished to them the name, address and telephone number of the district superintendent so they could communicate with the latter at once. None of plaintiffs or their guardians or parents contacted the district superintendent, however, and the latter, under the circumstances, arranged to meet with School Superintendent Shedd the following day, at which meeting Principal Bass was invited to and did

attend. The decision of the district superintendent, concurred in by the school superintendent was that the four minor plaintiffs be transferred, each to separate high schools. We are of the opinion that plaintiffs were given a fair hearing and were given the opportunity to discuss the problem with the district superintendent. This, they failed to do. Plaintiffs were afforded procedural due process in the handling of this matter. They were not wrongly transferred.

The transfer of a student from one high school to another cannot be regarded as in the same category as either expulsion, or suspension for a substantial time. While transfers may result in certain inconveniences, such as a longer distance for travel or the failure of the second high school to carry a special subject, they do not prevent the student from securing a full high school education. On the other hand, expulsion, or suspension for a substantial time, result in deprivation of education and are considered severe punishment.

The Act of May 18, 1911, as amended, 24 PS §13-1310, grants school districts the right and duty to assign pupils in the following language:

". . . The board of school directors may, upon cause shown, permit any . . . pupils in any school district to attend such other school in the district as the board may deem proper, or may classify and assign the pupils in the district to any school or schools therein as it may deem best, in order to properly educate them . . ."

Defendant, School District of Philadelphia, acted within the provisions of that act in effecting the said transfers. It did not abuse its discretion or act arbitrarily in sending minor plaintiffs, each to a different high school. It cannot be said that minor plaintiffs have been deprived of any constitutional right.

## ORDER

In view of the foregoing, it follows that the prayer for the injunction by plaintiffs must be refused and the bill dismissed at their costs.